**J. UNGAR, Inc., Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Jesse UNGAR (Transferee), Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

Nos. 271, 272, Dockets 24349, 24350.

United States Court of Appeals Second Circuit.

Argued April 5, 1957.

Decided May 13, 1957.

Adrian W. DeWind, New York City, Richard H. Paul, New York City, of counsel, for petitioners.

Melva M. Graney, Washington, D. C., (Harry Baum, Washington, D. C., with her on the brief), Charles K. Rice, Asst. Atty. Gen., for respondent.

Before CLARK, Chief Judge, and HAND and LUMBARD, Circuit Judges.

HAND, Circuit Judge.

This is a petition to review an order of the Tax Court *in banco,* opinion by Rice, J., 26 T.C. 331, with whose findings and conclusion we are in accord, which held that a New York corporation (which we shall call the Corporation), was liable for a deficiency of $31,957.21 for unpaid income and excess profits tax for its fiscal year, ending February 28, 1951. The only issue is as to the amount of the corporate income during the year in question. The Corporation had been doing a commission business as agent for a Spanish exporter of olives and olive oil which we shall call Exportadora, and also as broker for a New York agent of importers of dates (Balfour Guthrie & Co.). Ungar was the only shareholder of the Corporation and in absolute control of its business. The Corporation's contract with Exportadora was for a percentage upon sales procured by it, which were subject to Exportadora's confirmation and approval; it provided that all shipments should be made against buyers' letters of credit, and that the Corporation should not be entitled to commissions until the goods were shipped, all shipments being subject to the regulations of the Spanish government. Ungar became ill and wished to retire from the business. He got leave from Exportadora to sell the Corporation, but was unable to find a buyer, and in the summer of 1950 decided to continue the business as an individual until he could do so, which he

did in October 1951. On September 1, 1950, Exportadora made a contract with him individually to last for ten years, in substance replacing him for the Corporation but without any change in the manner of doing business. On the 15th the Corporation followed this by formally assigning to him all its assets except such "cash as may be required as a reserve for the payment of all liabilities of J. Ungar, Inc." The assets so transferred included $18,659.75 in cash; $27,042.38 in "commissions receivable"; $57,172.77 described as the "Right to Receive Commissions on Unshipped Orders, Commissions not accrued on September 15, 1950"; and about $5,500 in chattels. The only item in dispute is that for commissions not accrued on September 15.

As a new question it is indeed hard to see why the transfer of a business for purposes of liquidation from a corporation to its single shareholder—or for that matter to its shareholders collectively—should be different for tax purposes from liquidation by a receiver, which is treated as a continuation of the corporate business.[1] In the case at bar Ungar did indeed continue the business under the contract of September 1, 1950 with Exportadora, but it is often true that a receiver continues a business awaiting a favorable sale of it as a going enterprise in order to preserve its good will and avoid disposing of the property as scrap. The shareholders have no just complaint when this is done; for the corporate rates are imposed because they have enjoyed the privilege of limited liability that incorporation gives, and liquidation is as much a part of the original venture as its active conduct. We cannot help thinking, therefore, that it would better have accorded with the underlying thesis of the Revenue Law for courts to regard an assignment in liquidation by a corporation to its shareholders, as no more than a procedural step in the corporate enterprise; that is, its termination. However, there is enough contrary authority to make it at least doubtful whether such a disposition of the case at bar would be permissible.[2]

So far as concerns claims against others, such assignments have been dealt with as "anticipatory assignments"; and the income is charged against the assignor, when he or it has "earned" it, and, in the case of a corporation, when it has not wholly ceased to function. In Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731, the test was first applied whether the assignor had "earned" payments that he had assigned in advance to his wife; but that was founded upon the words of the statute. In Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75, and Helvering v. Eubank, 311 U.S. 122, 61 S. Ct. 149, 85 L.Ed. 81, if we rightly understand them, the income was attributed to the assignor because, although he had parted with the claim before it was due, his gratification in the assignee's possession of the proceeds was income arising at that time. On that theory one would suppose that the doctrine would be limited to occasions when the assignor and the assignee were associated by some affectionate relationship. In United States v. Joliet & Chicago R. Co., 315 U.S. 44, 62 S.Ct. 442, 86 L.Ed. 658, there was no such relation but the assignor, as in the case at bar, was a corporation, and the payees of the rent were its shareholders, to whom the successive rentals were paid directly as dividends. This is a direct authority in the case at bar, provided that the commissions were already "earned" on September 15, and that the Corporation had then as completely terminated its business as had the lessor railroad.

1. Treasury Regulations 111, 1939: § 29.22 (a)-20; O'Sullivan Rubber Co. v. Commissioner, 2 Cir., 120 F.2d 845; Fairfield S.S. Corp. v. Commissioner, 2 Cir., 157 F.2d 321, 323.

2. United States v. Cumberland Pub. Serv. Co., 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251; United States v. Horschel, 9 Cir., 205 F.2d 646; Telephone Directory Advertising Co. v. United States, Ct.Cl., 142 F.Supp. 884.

The petitioner says first that the payment of the "Future Commissions" had not been' "earned" on September 15, 1950; and second, the Corporation then wholly ceased to function. It is true that all sales by Exportadora were subject to defeat by conditions some of which might arise after September 15; but, none of the commissions claimed was so defeated. Moreover, all these conditions subsequent were independent of any action by the Corporation. We do not mean that contingencies might not have arisen that it would have been within the power of the Corporation to control; but we do mean that in fact none did. Although these possibilities make it permissible to treat the commissions as "unaccrued" till the goods were shipped, that is irrelevant. The petitioner asserts, however, that it did perform after September 15 some of the services which were the consideration for the commissions, and that therefore these had not been wholly "earned" on September 15. We do not agree. All that Ungar personally did after September 15, was as follows: "During the latter part of September and during October, Ungar engaged in negotiations with Exportadora for the filling of the orders prior to the expiration of the renewed letters of credit. * * * Ungar was afraid that if the shipments were not made prior to the expiration of the letters of credit or the export licenses, the purchasers would no longer be obligated to buy. * * * He believed that if a break in the market price below $65 had occurred between October and the end of December, as to any letters of credit then expired, that such contracts would not be fulfilled and that he would lose his commissions thereon." Again: "Shipments made during October and November were so small in quantity that Ungar obtained permission from Exportadora to prorate them among its various customers." As to this last statement it is important to observe that one of the conditions of the contracts was as follows: "This contract shall be deemed severable as to all goods sold, and non-delivery, delayed delivery or non-conformity with contract requirements as to any part or lot shall not affect Buyer's obligations to accept and pay for any other part or lot." Although it may indeed be true that the activities just described were beneficial to the buyers in the sense that if conditions had changed they would have helped to protect the sales, nevertheless they turned out to be no part of the services that were part of the consideration for the Corporation's commissions. They were at most provision against the possible defeat of the sales.

Next as to the argument that the Corporation altogether ceased to exist on September 15. Although, again as a new question, we do not see why that should be determinative, we do not think that the Corporation had ceased to exist. Section 29.52–1 of Regulations 111 of 1939 reads in part as follows:

"* * * If a corporation was not in existence throughout an annual accounting period * * * the corporation is required to make a return for that fractional part of a year during which it was in existence. A corporation is not in existence after it ceases business and dissolves, retaining no assets, whether or not under State law it may thereafter be treated as continuing as a corporation for certain limited purposes connected with winding up its affairs, such as for the purpose of suing and being sued. If the corporation has valuable claims for which it will bring suit during this period, it has retained assets, and it continues in existence. * * * "

We cannot avoid reading this language as meaning that a corporation in process of liquidation is still in existence, if it retains assets to pay its debts, or indeed to distribute among shareholders; and that, where that is true, its return must include the period of the "reten-

**94**

tion." This may indeed seem to be a strange condition to impose, but in taxation it is often true that, not only in the beginning but at the ending, is the Word. Of a regulation, as well as of a statute it is usually, though not so rigidly, true that, "having determined that different tax consequences shall flow from different methods by which the shareholders of a closely held corporation may dispose of corporate property, we accept its mandate." United States v. Cumberland Public Service Co., supra, 338 U.S. 451, at page 456, 70 S.Ct. 280, at page 282.

Order affirmed.