UNITED MERCANTILE AGENCIES, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 66537. Filed August 8, 1960.

*Jerome C. Bachrach, Esq.,* for the petitioner.
*S. Earl Heilman, Esq.,* for the respondent.

BRUCE, *Judge:* The respondent determined deficiences in income tax of petitioner for the years and in the amounts as follows:

| Year ended | Deficiency |
| --- | --- |
| Dec. 31, 1953 | $15,589.07 |
| Dec. 31, 1954 | 799.66 |
| Jan. 1, 1955, to Nov. 30, 1955 | 134,477.86 |

The deficiency of $799.66 for the year 1954 has been conceded by petitioner. The deficiency, if any, for the year 1953 depends upon the amount of loss carryback available from the taxable year 1955, which, in turn, depends upon the decision of this Court on the single remaining issue of whether the respondent was correct in determining that petitioner realized taxable income on May 31, 1955, in the amount of $300,000 upon the dissolution of petitioner and the transfer of certain accounts receivable held for collection to the chief stockholder of petitioner. One other issue relating to the taxable year 1955 was settled by stipulation.

FINDINGS OF FACT.

The stipulated facts are found.

Petitioner is a corporate collection agency, incorporated July 1, 1917, in Kentucky. During the years involved petitioner's principal office was at 620 South Fifth Street, Louisville, Kentucky. The

returns for the years involved were filed with the district director of internal revenue at Louisville, Kentucky.

For all years herein involved petitioner kept its books and records and reported for income tax purposes on the cash receipts and disbursements method.

At all pertinent times, petitioner's stockholders and the number of shares held by each were as follows:

| Stockholder | Number of shares held |
| --- | --- |
| F. W. Drybrough | 273 |
| Marion S. Drybrough | 100 |
| D. Earle Hankins | 1 |
| H. E. Mahorney | 1 |
| Total outstanding | 375 |

On May 31, 1955, the directors and officers of petitioner were as follows:

| Directors | Officers |
| --- | --- |
| F. W. Drybrough. | D. W. Drybrough, president. |
| Marion S. Drybrough. | H. E. Mahorney, executive vice president. |
| D. Earle Hankins. | M. S. Drybrough, secretary. |
| H. E. Mahorney. | D. E. Hankins, assistant secretary-treasurer. |

On May 31, 1955, petitioner had in its possession, among other assets, some 7,000 so-called White files with a total face value (uncollected balances) of approximately $5 million. These files represented delinquent accounts receivable owed to petitioner's clients which had been forwarded to petitioner as agent for attempted collection on a contingent fee basis. Petitioner's clients were principally manufacturers, large companies with their own credit departments. Collection cases forwarded to petitioner were those on which its clients had already exhausted their own efforts at collection. Title to the accounts represented by the White files remained with the original creditors. Petitioner acted only as agent. Petitioner took each White file case on a strictly contingent fee basis. Unless and until it succeeded in making a collection, petitioner had no right to compensation for its services.

The steps taken by petitioner to collect the accounts receivable in the White files varied with the individual accounts, but normally two or three letters were sent by petitioner to the delinquent debtor, at least one telephone call was made, and, if necessary, a field representative would call on the delinquent debtor. The letters were form letters or individually dictated. The field representatives were specialists stationed throughout the country. Normally, an attorney was employed by petitioner only if the attempts to collect the accounts by letter or other means were unsuccessful.

The fees which petitioner became entitled to receive upon collection of all or part of a delinquent account varied from 15 to 50

per cent of the amount collected, the percentage depending upon the difficulty of collection, the size of the account, and the procedure used by petitioner in attempting to collect the account. If it was found necessary or advisable to utilize the services of an attorney for collection, petitioner chose the attorney and agreed to pay him a percentage of the contingent fee, usually two-thirds. In addition, the attorney charged a suit fee which was in addition to the percentage fee already mentioned but which was nonetheless contingent upon collection and came out of the amount collected. Upon collection of all or part of a delinquent account, the fee, and suit fee, if any, were deducted from the amount collected and the balance remitted to the creditor.

On May 31, 1955, approximately 79 per cent in number and 72 per cent in face value of the White files on hand had been referred by petitioner to outside independent lawyers for attempted collection under the arrangement above mentioned. On May 31, 1955, there was no way to tell whether a recovery would ever be had on any specific White file.

On May 25, 1955, petitioner's shareholders and directors authorized petitioner's total liquidation and dissolution. A plan was adopted calling for the distribution on May 31, 1955, pro rata to shareholders of all assets belonging to the corporation except for retention of cash to pay direct and contingent liabilities. On May 31, 1955, a "Statement of Intent to Dissolve" was filed by petitioner with the secretary of state of Kentucky at Frankfort.

On May 31, 1955, petitioner's shareholders and directors voted to distribute in liquidation, at the close of business on the same day, all assets other than cash to F. W. Drybrough upon his agreement to pay cash or its equivalent to the other three shareholders for their shares of such assets. It was further resolved that the corporation cease all activities as of May 31, 1955, "[o]ther than those incident to the determination and payment of its existing liabilities and the distribution of any remaining cash to the stockholders."

On May 31, 1955, petitioner made the following entry on page 69 of its general journal:

| | | |
|---|---|---|
| Distribution in complete liquidation | $197,600.52 | |
| Court costs—1953 | 5,624.45 | |
| Court costs—1954 | 7,633.65 | |
| Court costs—1955 | 7,426.41 | |
| Client ledger | | $19,395.68 |
| Improvements to leased property | | 24,445.58 |
| Office equipment—Chicago | | 3,363.37 |
| Office equipment—Louisville (straight line) | | 26,447.96 |
| Office equipment—Louisville (declining balance) | | 15,381.30 |
| Purchase ledger | | 129,251.14 |

To record distribution of above assets to F. W. Drybrough and assumption of above liabilities by him as a liquidation [sic] in complete liquidation.

The assets of petitioner other than cash and the White files, were transferred to Drybrough by deeds, assignments, and other appropriate instruments which were duly executed and recorded. No written assignment from petitioner to Drybrough was required to transfer the White files to him since petitioner had no legal title to them. The White files were located in steel file cabinets on the premises occupied by petitioner and owned by Drybrough. The White files were transferred to Drybrough by his taking physical possession of them on June 1, 1955.

On May 31, 1955, Drybrough filed a "Declaration of Ownership" as sole proprietor of United Mercantile Agencies in the office of the clerk of the County Court of Jefferson County, Kentucky.

On June 1, 1955, F. W. Drybrough, doing business as United Mercantile Agencies, a sole proprietorship, made the following entry on page 1 of his general journal:

```
Opening entries:
Improvements—620 S. Fifth Street _____ $24,445.58
Office equipment _____   45,192.63
Client ledger _____   19,395.68
Gold files _____  255,000.00
Green files _____  200,000.00
Red files _____    4,500.00
White files _____  300,000.00
                                                     _____
                                                      848,533.89
                                                     ===========

    Court costs—1953 _____  $5,624.45
    Court costs—1954 _____   7,633.65
    Court costs—1955 _____   7,426.41
    F. W. Drybrough, investment _____  827,849.38
                                                     _____
                                                      848,533.89
                                                     ===========
```

In his 1955 Federal income tax return, Drybrough reported receipt of the White files, assigned them a valuation of $300,000, and paid income tax thereon computed as a capital gain. No part of the $300,000 value assigned to the White files was ever accrued or recorded on petitioner's books. The expenses in connection with petitioner's collection activities were currently deducted by petitioner in its income tax returns. Petitioner received no fees after May 31, 1955, from the collection of the delinquent accounts represented by the White files. From June 1, 1955, through November 30, 1955, Drybrough collected fees of $124,020.76 from the collection of delinquent accounts receivable represented by the White files received on liquidation of petitioner. By December 31, 1958, Drybrough had realized fees totaling $273,716.09 from the same source. During the year 1959, fees from this source were averaging $700 per month. Drybrough expects to ultimately recover more than $300,000 in fees

812

from the White files received by him on the liquidation of petitioner.

After May 31, 1955, petitioner recorded on its books the following cash transactions:

|  | Debit | Credit |
|---|---|---|
| Cash in bank, May 31, 1955, per books_____ | $256, 357. 96 | |
| Summary of transactions in petitioner's cash journal during June 1955: | | |
|   Old outstanding checks, drawn prior to June 1955, restored to cash balance_____ | 3, 241. 41 | |
|   Liquidating distribution to shareholders, June 13, 1955_____ | | $100, 000. 00 |
|   Payments of creditors' bills for periods prior to May 31, 1955_____ | | 8, 951. 84 |
|   Employees' bonus and commission for May 1955_ | | 3, 740. 56 |
|   Employees' withheld Federal, State, and city income and payroll taxes for April and May 1955_ | | 6, 245. 78 |
|   Employer's payroll taxes for April and May 1955_ | | 1, 008. 43 |
| | 259, 599. 37 | 119, 946. 61 |
| Cash in bank, June 30, 1955_____ | 139, 652. 76 | |

All transactions in petitioner's cash journal after June 1955:

*1955*

| | Debit | Credit |
|---|---|---|
| Aug.  1 District director—Federal unemployment tax_____ | | $397. 14 |
|     1 Kentucky State treasurer—intangible tax, penalty and interest for prior years_____ | | 1, 320. 98 |
|     1 Legal fees re 1942–1946 tax liabilities_____ | | 4, 885. 64 |
|     3 District director—additional taxes, years 1942–1946 inclusive_____ | | 120, 170. 05 |
|     9 Accounting fee re 1942–1946 tax liabilities_ | | 1, 000. 00 |
|   25 Additional Kentucky income tax, years 1942–1946 inclusive_____ | | 3, 625. 96 |
| Sept.  1 Kentucky tax on bank deposits_____ | | 16. 10 |
|   30 Voiding $56 of pre-May 31, 1955, checks, less $16.19 fees returned_____ | 39. 81 | |
| Nov. 22 District director—balance of additional tax liabilities, years 1942–1946 inclusive_ | | 16, 444. 15 |
|   23 Loan from F. W. Drybrough_____ | 8, 200. 00 | |
|   30 Journal entry cancelling still outstanding checks written prior to 1955 and restoring them to cash balance_____ | 679. 11 | |
| | 148, 571. 68 | 147, 860. 02 |
| Nov. 30 Final liquidating distribution_____ | 711. 66 | |

Form 966, Return of Information to be Filed by Liquidating Corporations, was filed by petitioner with the district director of internal revenue at Louisville, Kentucky, on or about June 17, 1955.

On August 3, 1955, Drybrough forwarded $120,170.05 to the dis-

trict director at Louisville, together with the following letter in explanation:

Mr. William Gray,
*District Director of Internal Revenue,*
*Louisville, Kentucky.*

Dear Sir:

Enclosed find check of United Mercantile Agencies, Inc. in the amount of $120,170.05. The amount of the check has been computed as follows:

| | | |
|---|---:|---:|
| Unpaid deficiencies in taxes and penalties as shown by Rule 50 computation in the case of United Mercantile Agencies, Inc. by Tax Court Docket No. 40028 | | $136,646.56 |
| Less: Post war refund Excess Profit Tax for the years 1942 and 1943, due to the taxpayer in reduction of the above amount | $8,735.83 | |
| Less: Claim for refund of overpayment of income tax for the calendar year 1947 | 7,740.68 | 16,476.51 |
| Amount of check | | $120,170.05 |

United Mercantile Agencies, Inc. ceased business as of May 31, 1955, and is in process of complete liquidation. In order to wind up the affairs of the corporation, it is necessary that all of its liability be determined and paid. The most material of these liabilities is that for Federal income tax, which, to the best of our knowledge, is as shown above except as to interest. Will you, therefore, compute the interest payable on the above deficiencies and furnish me with the amount necessary to close this account in its entirety?

Very truly yours,

1/36                                           /s/  F. W. Drybrough

On August 19, 1955, the district director replied to the above letter with the following communication:

Mr. F. W. Drybrough
*President*
*United Mercantile Agencies, Inc.*
*620 South Fifth Street*
*Louisville 2, Kentucky*

Dear Mr. Drybrough:

Receipt is acknowledged of your letter dated August 3, 1955, with check of United Mercantile Agencies, Inc. in the amount of $120,170.05 to be applied against unpaid deficiencies in income taxes, penalties and interest which have been proposed against the company. You asked that we advise you respecting the interest payable on the proposed deficiencies inasmuch as the corporation is in process of liquidation and you desire to make provision for same.

The payment of $120,170.05 referred to above will be applied against deficiencies in tax, penalties and interest as shown in the attached schedule. Application of the payment in this manner eliminates the liability for taxes and interest to August 3, 1955, without taking into consideration the post war refund credits totaling $8,735.83 for the years 1942 and 1943 and the claim for refund of an alleged overpayment of taxes for the year 1947 in the amount of $7,740.68. Adjustment for the post war refund credits will be made in the National Office and no action has yet been taken on the claim for refund filed for 1947.

On the basis of the foregoing, as shown by the attached statement, there remains an unpaid balance of the deficiencies in tax, penalties and interest which have been proposed for the years 1942 to 1946, inclusive, of $38,696.84, all which represents penalties; no interest accrues on these penalties until they are assessed. Assessment of these proposed deficiencies is being deferred pending expiration of the period allowed for appeal from the decision of the United States Tax Court which will be on September 16, 1955.

Action on the claim for refund filed for 1947 will be deferred pending final decision respecting the taxable income and liability for the prior years.

Very truly yours,

WM. M. GRAY
*District Director*
/s/ Wm. H. Leavell
By: WM. H. LEAVELL
*Chief, Audit Division*

Enclosure as above

On November 22, 1955, Drybrough forwarded a check in the amount of $16,444.15 to the district director at Louisville together with the following letter in explanation:

Mr. William M. Gray
*District Director of Internal Revenue*
*Louisville, Kentucky.*
Attention: Mr. John N. Bowden, *Chief*
            *Delinquent Accounts Branch*
Dear Sir:

Check of United Mercantile Agencies, Inc., in the amount of $16,444.15 is enclosed. The amount of this check is computed as follows:

| | | |
|---|---:|---:|
| Unpaid balance of liability for the years 1942 to 1946, inclusive, as shown by attached bills | | $27,479.22 |
| Less: | | |
| Refund due for 1947 | $7,740.68 | |
| Interest due on refund | 3,294.39 | 11,035.07 |
| Amount of check enclosed | | $16,444.15 |

The refund due for 1947 is covered by a claim for refund in that amount. It arose from reductions in income in that year which resulted because amounts reported in 1947 were transferred to prior years in the examination of the returns for those years. These transfers increased the income for the years covered by your bills. The claims filed at the written suggestion of Mr. Edward Cox, then Internal Revenue Agent In Charge, in order that the item of income be not taxed both in 1947 and prior years.

The claim for refund has recently been examined by Mr. Clifford L. Phillips of the Audit Division and I have been advised that he has recommended its full allowance. It is my understanding that the claim is now being processed through the Audit Division.

Interest has been computed on the amount of the refund from the actual dates of installment payments in 1948 to November 14, 1955, the date of assessment of the deficiencies for 1942 to 1946, inclusive.

In view of the fact that the corporation is entitled to a refund which is now in process the balance due as shown by your bills has been reduced by the amount of such refund. This matter was discussed by telephone with Mr.

Bowden, who suggested that a letter such as this be written to support the deduction from the bills.

Yours very truly,

/s/ F. W. Drybrough

On November 30, 1955, petitioner's directors met to make the final liquidating distribution. On this date the corporation's only assets were $711.66 in cash and an operating loss carryback tax refund claim of $15,589.07. Against these assets the corporation owed $8,200 to Drybrough for cash he had loaned it on November 23, 1955. Drybrough agreed to take over said net remaining assets, subject to paying their pro rata shares to the other stockholders. On November 30, 1955, petitioner made the following entry in its general journal:

Distribution in complete liquidation _____ $8,100.73
Loan payable—F. W. Drybrough _____ 8,200.00
  Cash _____ $711.66
  Federal tax—carryback refund due _____ 15,589.07
    To record final distribution of assets

In the notice of deficiency, respondent made the following explanation of his determination that the income of petitioner in 1955 should be increased by $300,000:

During the process of dissolution at 5/31/55, you transferred to F. W. Drybrough, principal stockholder, certain delinquent accounts which had been placed in your hands for collection on a fee basis, which you valued at $300,000.00. The face value of the accounts was approximately $5,000,000.00, and it had been determined that the accounts were about one-half processed. It appears that the valuation placed thereon was computed on the basis of average fees collected x ½ x total accounts outstanding, or 12% x $5,000,000.00 x ½—$300,000.00.

The $300,000.00 valuation was used in computing the long-term capital gain on liquidation, on the individual return of Mr. Drybrough. This results in the $300,000.00 of collection fees being subject to capital gain rates only, as you report your income on the cash basis and therefore the fees in question were never reported as income.

It has been determined that your valuation was based on that portion of fees earned or attributable to your efforts, and by the process of assigning the right to receive said fees, you in effect realized income thereon. Therefore adjustment is made to increase income in the amount of $300,000.00.

OPINION.

On brief, the respondent states his position as follows:

It is the position of respondent that he properly determined in the statutory notice of deficiency that there was includible in petitioner's income $300,000.00 for the year of liquidation. It is his position that a portion of the fees had been earned by petitioner at that time under the rationale of *Jud Plumbing & Heating, Inc.* v. *Commissioner* (C.C.A. 5th 1946) 153 F. 2d 681, 34 A.F.T.R. 1025, aff'g (1945) 5 T.C. 127, and similar cases; that the allocation was reasonable and petitioner has failed to show that the amount of

income was other than that determined; and that the determination is in all respects proper.

In his reply brief, respondent further explained his position as follows:

As shown in respondent's original brief, the Commissioner's determination has been made on the rationale of *Jud Plumbing & Heating, Inc.* v. *Commissioner* (C.C.A. 5th 1946) 153 F. 2d 681, 34 A.F.T.R. 1025, aff'g (1945) 5 T.C. 127, and like cases. They hold that under the provisions of section 41 of the Internal Revenue Code of 1939 a corporation which has uncompleted contracts at the time of dissolution is taxable on that portion of the income earned by it prior to dissolution, although the amount may be collected or received by the stockholders who received the contracts in liquidation and completed them; that is, a corporation may not escape taxation by the simple expedient of dissolving prior to the completion of its contracts.

The *Jud Plumbing & Heating, Inc.*, case (5 T.C. 127, affd. 153 F. 2d 681) does not, in our opinion, support respondent's determination in the instant case. The facts in that case are materially different from those presented in the instant case.

The *Jud Plumbing* case involved a corporation engaged in general contracting for the installation of plumbing and heating systems and in general repair work on such systems. The pertinent facts and the issue presented in that case are summarized in the opinion of this Court as follows:

The issue in this proceeding requires a determination of the correct method of accounting to be used by the corporation in computing its income for the last period of its existence. The corporation used two different methods of accounting, one for its repair work and the other for its contract work. Only the method used for the contract work is in controversy here.

The corporation had been in existence since 1926. For a number of years prior to the taxable year, it had computed its income from the contract work on the completed contract method of accounting, which takes into gross income, for tax purposes, the profits or losses upon the completion of the contract. The corporation was formally dissolved on September 5, 1941, and all of its assets were transferred to petitioner, Ed. J. Jud, as of August 31, 1941. At that date the corporation had 22 uncompleted contracts in process of construction. These contracts, which were in various stages of completion, were taken over by Jud, personally, and completed by him during the taxable year, and the income from the contracts was taken into account in the community returns of the individual petitioners. The corporation did not compute any profits from these uncompleted contracts at the date of its dissolution, nor did it take into account as taxable gross income any amount with respect to these contracts.

The respondent has determined the deficiencies upon the basis of the four largest contracts. He has ignored the other 18 contracts as being insignificant, although 16 resulted in an ultimate profit and 2 in an ultimate loss. The respondent has determined the profit on each of the 4 contracts to August 31, 1941, by computing the ratio of costs incurred to August 31, 1941, to the final costs on each contract and then applying that ratio to the total profits on each contract.

In our opinion sustaining the determination of the respondent we stated:

*The fundamental concept of taxation is that income is taxable to him who earns it and that concept, we think, is correctly applied by the respondent here.* That the corporation earned the income which respondent has taxed to it seems apparent from the facts. * * *

Both parties are agreed that the only question for determination in the instant case is whether petitioner had "earned" any income from the White files transferred to Drybrough on May 31, 1955, and, if so, the amount thereof. The question presented is a factual one. In *Jud Plumbing* there was a clear factual situation revealing that the corporation had performed a portion of the work involved in certain contracts and the aliquot part of the income realized from such contracts as of the date of dissolution was readily determinable. Actually, the corporation had received a substantial portion of the money due it prior to dissolution. The fact that the corporation utilized a system of accounting which did not report income until a contract was actually completed was not allowed to prevent the allocation of that income to the corporation upon liquidation.

The situation in the instant case is entirely different. Here, the only income which could be realized from the White files consisted of fees which were wholly contingent upon the actual collection of all or a part of the delinquent accounts. It mattered not how much time, money, and effort were expended upon an attempt to collect. No contractual or *quantum meruit* right arose from such expenditures. No conceivable income could accrue for services rendered which failed to produce the collection of the accounts. None of the White files turned over to Drybrough had been collected. Unsuccessful attempts to collect had produced nothing of value whatsoever.

Respondent argues that the process involved in the installation of a plumbing and heating system can be likened to the process involved in the collection of a delinquent account, i.e., that there is a step-by-step progression to a finished product and that each step produces co some degree the ultimate income realized. We do not agree with this analogy. In the case of the construction of a building or the installation of a plumbing and heating system, where, as in the *Jud Plumbing* case, the contractor is performing this work under a contract which provides for the payment of a fixed price for the work, there is a basis for the proposition that each nail driven or each joint sealed created, to some degree, the income ultimately to be realized upon completion. There is an ascertainable and demonstrable value resulting from the completion of each stage of the work. Indeed, in the *Jud Plumbing* case substantial payments had been made prior to completion. Such is not the situation in the instant case. A letter or telephone call to a delinquent debtor which produces no

payment is worthless. A collector who calls in person upon the debtor and fails to collect has produced nothing of value.

In the *Jud Plumbing* case, taxpayer relied upon the fact that it utilized the completed contract method of accounting and that under such method, it was not required to report income until the contracts were completed. This argument was used despite the fact that the taxpayer had actually received a substantial part of the contract prices prior to its dissolution. In the opinion in the *Jud Plumbing* case, this Court said:

> The method of accounting in connection with long term contracts authorized by the regulations clearly reflects income if it is consistently used and if the taxpayer continues in existence. However, if a corporation using that method is liquidated during the taxable year and prior to the completion of the contracts, the completed contract method of accounting does not clearly reflect income for the final period of the corporation's existence. Therefore, under section 41 the respondent is authorized to recompute the corporation's income by the use of such method as will clearly reflect the income. The effect of the method used by the respondent in this proceeding is to reallocate the income from the contracts in proportion to the work done by the respective parties. * * *

In the instant case, petitioner does not rely upon an accounting method which is inconsistent with reality, but rather upon the non-occurrence of the income-producing contingency, namely, the collection of the delinquent accounts. The *Jud Plumbing* case is not in point; nor are the numerous other cases cited by respondent which followed it.

The case of *Dillard-Waltermire, Inc.* v. *Campbell*, 255 F. 2d 433, referred to by respondent in his brief, is likewise not in point. There uncompleted oil well drilling contracts were transferred. Although the transferring taxpayer was "not entitled to any of the contract price unless the well is drilled to the prescribed depth in accordance with the contract," the fact remains that valuable work was performed and a portion of the contract price earned with each foot of well drilled.

The anticipatory assignment of income theory advanced by respondent is likewise not applicable herein. In *J. Ungar, Inc.*, 26 T.C. 331, affd. 244 F. 2d 90, this Court set forth the bases of the theory as follows:

> It is well established that where an individual assigns to another the right to receive the income from future services to be rendered by the assignor, such income, when earned and received, will nevertheless be taxed to the assignor. *Lucas* v. *Earl*, 281 U.S. 111 (1930). Similarly, if a taxpayer makes a gift of the right to receive all or a portion of the income from property, such property being retained by the taxpayer, the income will be taxable to the assignor when received by the assignee. *Helvering* v. *Horst*, 311 U.S. 112 (1940). And, if an individual who has negotiated certain contracts assigns his right to receive the commissions from such contracts as they are per-

formed, he will be taxed upon the commission income as it is realized by the assignee. *Helvering* v. *Eubank,* 311 U.S. 122 (1940). While most of the anticipatory assignment of income cases have related to donative assignments by individuals, the doctrine is equally applicable to corporations which may attempt to escape tax liability by directing that income properly payable to them be paid, instead, to their stockholders. *United States* v. *Joliet & Chicago R. Co.,* 315 U.S. 44 (1942).

There is no basis in the instant case for the proposition that any of the income ultimately realized from the White files had been earned by or was "properly payable" to petitioner.

The facts and circumstances of the instant case bring it more nearly within the purview of our decision in *Pat O'Brien,* 25 T.C. 376. In that case, we said:

The second argument which the respondent advances for disregarding Terneen's corporate dissolution in 1944 is predicated on the basis of the holding of *Commissioner* v. *Court Holding Co.,* 324 U.S. 331 (1945). In that case, the Supreme Court held that a corporation could not negotiate for the sale of its property and then transfer the property to its stockholders and dissolve; thus permitting them to receive the purchase price for the property and itself escape taxation. The doctrine of the *Court Holding Co.* case is confined to the facts on which it was decided. *United States* v. *Cumberland Pub. Serv. Co.,* 338 U.S. 451 (1950). It obviously is not applicable to the facts here because Terneen did not arrange for the sale of anything. It did not pass on to its stockholders, upon its dissolution, a substantially completed contract for the sale of its assets. It assigned to them only its right, title, and interest in the film "Secret Command," which was subject to the distribution agreement signed more than a year previously with Columbia. While the stockholders expected to realize a profit on the assets transferred to them, there was no assurance that they would do so. Columbia agreed only to distribute the picture; it did not agree to buy it.

In the instant case there is no doubt that Drybrough expected to, and actually did, collect a substantial amount of the delinquent accounts represented by the White files, but there was no assurance that he would do so, and certainly no assurance as to what amount, if any, he would collect. Petitioner had not, on May 31, 1955, earned any of the fees ultimately collected by Drybrough on the White files. Accordingly, respondent's determination that petitioner realized taxable income in the amount of $300,000 upon the dissolution of petitioner on May 31, 1955, is not sustained.

*Decision will be entered under Rule 50.*