**WOOD HARMON CORPORATION,
Plaintiff-Appellant,**

v.

**UNITED STATES of America,
Defendant-Appellee.**

No. 141, Docket 27757.

United States Court of Appeals
Second Circuit.

Argued Nov. 29, 1962.

Decided Jan. 7, 1963.

---

Cleary, Gottlieb & Steen, New York City (George E. Cleary, New York City, of counsel), for plaintiff-appellant.

Vincent L. Broderick, U. S. Atty., Southern District of New York (Robert Arum and Arnold N. Enker, Asst. U. S. Attys., of counsel), for defendant-appellee.

Before CLARK, MOORE and KAUFMAN, Circuit Judges.

KAUFMAN, Circuit Judge.

The appellant, Wood Harmon Corporation, brought an action in the District Court to obtain a tax refund, but suffered an adverse judgment on cross-motions for summary judgment. Wood Harmon, as transferee of United Cities Realty Corporation (hereinafter called United), contests on appeal only that part of the District Court's judgment holding United liable for a capital gains assessment on one of the payments from the City of New York resulting from the condemnation of certain property owned by United. The essential facts are not in dispute, and the court below disposed of the motions on stipulated facts.

United, the appellant's transferor, was a New York corporation which at one time owned an undivided five-sixths interest in premises commonly known as 71 Washington Square South in the City of New York. The City had commenced condemnation proceedings against the Washington Square property in January 1955 by filing a petition in the New York State Supreme Court. Realizing that any condemnation payments would probably result in a substantial liability for capital gains tax, United's Board of Directors, on July 18, 1955, resolved to call a special meeting of stockholders on August 8, 1955, "for the purpose of considering a proposal of dissolution of the corporation and the adoption of a plan of liquidation of its assets." By the adoption of such a plan, the directors intended to avail themselves of the tax benefits bestowed by section 337 of the Internal Revenue Code of 1954,[1] which provides that a corporation adopting a plan of complete liquidation and distributing all of its assets within twelve months thereafter shall recognize no gain or loss "from the sale or exchange by it of property within such 12-month period." The stockholders' meeting was held on August 8, 1955, at which time a resolution to liquidate United was duly adopted.

Unfortunately for United, its well conceived plan was frustrated. On August 5, 1955, three days *before* the effective adoption of the plan of liquidation,[2] an

---

1. 26 U.S.C. § 337(a): "If—

 "(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and

 "(2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,

 then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period."

2. We have not, at any stage of these proceedings, had called to our attention the question whether United's plan of liquidation was effectively adopted at the July 18, 1955 meeting of the Board of Directors rather than at the August 8, 1955 meeting of the shareholders at which the plan was formally adopted. If the former is the operative date, then it might be argued that the sale of the Washington Square property fell within the twelve-month period prescribed in section 337. Apparently the appellant concedes that August 8 was the operative date, and well may it do so. The minutes of the earlier directors' meeting reveal that only tentative steps were taken to arrange for a plan of liquidation, certainly nothing amounting to an adoption of a plan of

ex parte order was entered in the New York Supreme Court condemnation proceeding, which vested legal title to the Washington Square property in the City of New York. On March 8, 1956, United received from the City an advance payment of $225,000, on account of the then undetermined amount of the award for United's interest in the condemned Washington Square property. Apparently believing that this payment, which exceeded the cost basis of the property by more than $45,000, fell within the terms of section 337, United reported this gain as nontaxable on its "short" tax return filed for the period January 1, 1956 to July 30, 1956.

On June 28, 1956 United assigned to the Commercial State Bank, purportedly as trustee for United's shareholders, all of United's right, title, and interest in any further payments to be made by the City of New York relating to the condemnation. Shortly after, and prior to July 30, 1956, United delivered to the Commercial State Bank all of its assets other than $2,436.93 which United retained to pay liabilities. On July 30, the Bank distributed to United's shareholders all of the assets transferred from United other than the right to the proceeds from the sale of the Washington Square property.

The corporation having distributed its assets, and the City having made the initial payment on the condemnation award, all that remained undone was for the court to ascertain the exact value of the property condemned and to pay the balance (with interest on the entire award from August 5, 1955, the date title passed from United to the City) to Unit-

ed. The value of the property was fixed by court decree at $425,000, on September 29, 1956, and on December 3, 1956, the City of New York executed and delivered to United warrants covering the balance owing for United's interest in the Washington Square property—$129,166.67 was attributable to principal and $12,131.51 to interest. United endorsed the warrants to the order of the Commercial State Bank.

On October 14, 1960, the Commissioner of Internal Revenue levied against Wood Harmon, as transferee of United, an assessment of $54,874.08 (consisting of a tax of $44,302.72 and deficiency interest of $10,571.36) based on the gain allegedly realized by United from the condemnation payments of $225,000 on March 8, 1956 and the total payments of $141,298.18 on December 3, 1956. The assessment was paid by Wood Harmon, which then commenced the action in the court below for a refund.[3]

It should be noted that throughout the period from July 30, 1956, when United's assets were distributed to its shareholders, until December 3, 1956, when United received the final condemnation payments, the corporation retained a bank account in order to meet its liabilities. Starting with the $2,436.93, retained to pay liabilities and expenses, United's balance was in excess of $1,000 on January 1, 1957, and the final check in liquidation was not drawn on this account by United until April 30, 1957.

In the District Court, Judge Dawson held that the condemnation proceeding did not fall within the sheltering provisions of section 337, because the condemnation decree, which vested title in the

complete liquidation as required by section 337. The Board considered several possible plans and it was resolved merely to notify the stockholders of a meeting to be called for the purpose of considering a proposed dissolution and plan of liquidation. The President's letter of July 19, 1955 to the shareholders stated that "no final program has been formulated * * *." It is therefore safe to assume, as has the appellant, that the plan was adopted on August 8, 1955.

3. Soon after United's shareholders adopted their plan of liquidation, the directors proceeded to sell United's remaining assets, other than the Washington Square property. These assets included ten parcels of real property and a stock interest in a real estate corporation. On its tax returns during the relevant period, United returned the gains on these sales as nontaxable, contending that the sales were made pursuant to section 337. This determination by the corporation is not contested by the Commissioner.

City and which therefore constituted a "sale",[4] was handed down *prior* to the adoption of the plan of liquidation and not within the twelve-month period following the adoption of the plan of liquidation. He therefore granted the Government's motion for summary judgment, holding Wood Harmon liable for the capital gains tax resulting from the payments of March 1956 and December 1956. On appeal, Wood Harmon concedes the non-applicability of section 337 to the sale of the Washington Square property and does not contest the fact that United was properly taxable on the March 1956 payment from the City. It contends simply that the court below erred as to its tax liability regarding the December payment. This contention is not based upon the applicability of section 337 but upon the theory that United escaped liability for two reasons: (1) its claim to the balance of the condemnation payments— as fixed in September 1956 and paid in December 1956—was assigned to its stockholders, and the incidence of the tax was properly upon them as transferees rather than upon the transferor corporation; and (2) United was nonexistent as a corporate entity after July 30, 1956, and could not be subject to tax on sales proceeds received after that date.

We find both these contentions to be without merit, and we accordingly affirm the judgment of the District Court entered on defendant's cross motion for summary judgment.

## I.

Once we recognize that there are no problems confronting us on appeal which concern the uniquely corporate aspects of section 337, we find that the first assertion of error merely raises the problem, familiar in tax litigation, of the anticipatory assignment of rights to income. We hold that United, having consummated a sale of its property prior to the transfer of its assets in liquidation, was entitled immediately and fully to the proceeds of that sale; all that it assigned to its shareholders was the right to receive those proceeds, and this alone is not sufficient to relieve United of the tax burden resulting from the capital gain on the condemnation sale. United had "earned" the proceeds of the sale by surrendering its property, and it had a fully matured and enforceable claim thereto, despite the fact that the actual amount of the proceeds was undetermined on the date of the sale and on the date of the assignment. These circumstances bring this case well within the many cases upholding a tax upon the transferor who merely transfers the right to receive compensation from a sale of property already consummated or from services already rendered.

In the tax lawyer's primer are the cases of Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930); Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940); Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81 (1940), and Harrison v. Schaffner, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055 (1941). In Lucas v. Earl, the Supreme Court held that the breadwinner could not shift the incidence of the income tax on his future personal earnings merely by contracting to pay part of them to his wife. In Horst, the Court held that the taxpayer who retained the ownership of a bond but gave an interest coupon to his son was taxable on the interest collected by his son. In Eubank, the tax-

---

4. In concluding that there was an effective "sale" of the Washington Square property on August 5, 1955 when the decree of the New York court vested title in the City, Judge Dawson relied on Rev.Rul. 59–108, 1959–1 Cum.Bull. 72, and Commissioner of Internal Revenue v. Kieselbach, 127 F.2d 359 (3d Cir. 1942), aff'd, 317 U.S. 399, 63 S.Ct. 303, 87 L.Ed. 358 (1943). The appellant has apparently not seen fit to challenge this phase of the District Court's decision, for no question is raised on this appeal concerning the court's conclusion that the March 1956 payments on the August 1955 "sale" are properly attributable to the corporation. For purposes of analysis, then, the condemnation sale may be assimilated to an ordinary sales transaction where there is a consummated agreement to sell accompanied by an agreement to arrive at a specific price at some later date.

payer was liable for the income tax on renewal commissions earned by him as an insurance agent, the right to collect which had been assigned to another. In Harrison v. Schaffner, the Court held that a voluntary assignment by the income beneficiary of a trust of a percentage of the succeeding year's trust income was an anticipatory assignment of income which remained taxable to the assignor. The philosophy underlying these cases is that the taxpayer has performed services or has a vested interest in property which gives him an unrestricted claim to compensation or income therefrom; the exercise of the unfettered power to dispose of that income is deemed analogous to its enjoyment or realization, thus resulting in a tax upon the assignor rather than upon the assignee who receives the income in fact.[5]

The same principle is found in cases involving corporations, where the assignment of the claim to income in the form of compensation for services or proceeds from sales is usually to the shareholders as part of a plan of liquidation. This Court confronted the problem in Donner v. Commissioner, 227 F.2d 381 (2d Cir. 1955), a case where the facts were more favorable to the corporation than in the instant case. There, a corporation owning numerous parcels of land on which homes had been constructed distributed in liquidation all of its property after contracting to sell most, but not all, of the parcels. The purchaser of each parcel closed title to the property *after* the liquidating distribution to the shareholders had taken place. This Court noted that most of the parcels of land had been contracted for at the time of the distribution and that the corporation had already contracted with a sales agent relating to the sale of the remaining parcels. Since the corporation's contract rights had become relatively well determined and since the shareholders had no flexibility as to the administration of those contract rights at the time the property was distributed to them, we held the corporation taxable on the income from the sales of *all* of the parcels. The most recent pronouncement of this Court on the problem facing us is J. Ungar, Inc. v. Commissioner, 244 F.2d 90 (2d Cir. 1957). The taxpayer there was a corporation doing a commission business as agent for a Spanish exporter. The corporation obtained orders in the United States but was not entitled to commissions until the goods were shipped, all shipments being subject to Spanish government regulations. The sole shareholder of the taxpayer corporation, deciding to alter the form of the business, caused the dissolution of the corporation, assigning to himself all of its assets except some cash retained as a reserve for the payment of liabilities. One of the assigned assets was the right to commissions on unshipped orders. Shortly after the assignment of assets to the sole shareholder, goods were shipped by the exporter and income received by the stockholder. This Court, speaking unanimously in an opinion by L. Hand, held that the income received by the stockholder was properly included in the income of the corporation. We cited Horst, Eubank and related cases, finding that all essential services which were to be performed by the taxpayer in order to earn the commissions had been performed prior to the distribution of the right to receive compensation. See also Floyd v. Scofield, 193 F.2d 594 (5th Cir. 1952); Williamson v. United States, 292 F.2d 524 (Ct.Cl.1961).

The principle to be derived from these cases is that a taxpayer who has performed services or sold property, thereby "earning" the right to income to be paid in the future, cannot escape the tax on those earnings merely by transferring the right to income to a third person. It seems clear beyond peradven-

5. It has been stated that "the rule applicable to an anticipatory assignment of income applies when the assignor is *entitled* at the time of the assignment to receive the income at a future date and is *vested* with such a right." Cold Metal Process Co. v. Commissioner, 247 F.2d 864, 873 (6th Cir. 1957) (emphasis in original).

ture that United, in the case before us, having consummated a sale of the Washington Square property and immediately being entitled to the proceeds from that sale (although the payment was received later), falls directly within this principle; its subsequent liquidation and its assignment to its shareholders of the right to income from the sale does not make it any the less taxable on a capital gain secured as a result of the condemnation proceeding.

## II.

The appellant has set up a series of roadblocks which it feels must necessarily bar our travelling down the path we have so readily charted.

It is argued, first, that this case comes within the ambit of the principle established in Blair v. Commissioner, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465 (1937), rather than the Horst-Eubank line of cases. In Blair, the taxpayer assigned a portion of his life interest in a trust. The Supreme Court considered this a valid assignment not merely of a right to income arising from property retained by the taxpayer but as an assignment of the full equitable interest in the income-producing property itself. Since the taxpayer had transferred his interest in property, the Court held that he was not taxable on future income allocable to it. This holding was reaffirmed in Pearce v. Commissioner, 315 U.S. 543, 554, 62 S.Ct. 754, 86 L.Ed. 1016 (1942), where there was a true transfer of both the corpus and right to future income from property.

The appellant here contends that United brought itself within the Blair principle by stripping itself of the ownership of the Washington Square property in the condemnation proceeding and by ridding itself of the claim to the proceeds of the sale by assigning it to its shareholders. United views the claim against the City for the balance of the condemnation award as a capital asset, or more precisely as "property", the full beneficial ownership of which was transferred to another, as in Blair. At the time the

December proceeds were awarded, it is argued, United no longer had any interest in the income-producing "property", and the income was thereafter taxable to United's shareholders.

■ It is true that United had divested itself of the claim to the balance of the compensation award during the course of the liquidation distribution, but surely this is not the sort of "transfer of beneficial ownership in property" which transfers the incidence of taxation under Blair v. Commissioner. In *any* case of an anticipatory assignment of rights to income, it is not difficult to cloak the assignment so that it masquerades as a transfer of a property right or a capital asset, by arbitrarily assigning this label to the taxpayer's claim for future income. Wearing this disguise, even Lucas v. Earl, Horst, and Eubank would come within the Blair principle. In terms of the omnipresent botanical analogy, the "fruit" of the tree could always be transmuted into another "tree", the transfer of which would free the transferor from taxation. The appellant's argument therefore proves too much. Taxpayers have tried to make this argument in the past, see Heyman v. Commissioner, 176 F.2d 389, 392 (2d Cir.), cert. denied, 338 U.S. 904, 70 S.Ct. 306, 94 L.Ed. 557 (1949), Doyle v. Commissioner, 147 F.2d 769, 772 (4th Cir. 1945), but have been uniformly unsuccessful.

We are supported in our conclusion by the teachings of two Supreme Court cases, Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945), and United States v. Cumberland Pub. Serv. Co., 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251 (1950). In Court Holding Co., the taxpayer corporation concluded negotiations to sell its sole asset, an apartment house, to a third party. An oral agreement had been reached between the corporation and the purchaser as to the terms and conditions of the sale. Prior to reducing the oral agreement to writing, the corporation transferred the apartment house to its two shareholders in the form of a liquidating dividend. A formal written

sales contract which embodied substantially the same terms and conditions previously agreed on was then drawn up naming the shareholders as "vendors." The Supreme Court held that the gain on the sale should be attributed to the corporation, since for all intent and purpose it was the corporation which had consummated the sale of the apartment house. In Cumberland Public Service, a private power corporation, unable to compete effectively with a cooperative using TVA power, received an offer from the cooperative for the purchase of some of the corporation's assets which it rejected. Realizing that such acceptance by the corporation would result in a large capital gains tax payment by it, the shareholders arranged for the complete liquidation of the corporation and the acquisition by them of the equipment to be sold. Subsequent to the liquidation, the shareholders sold the desired properties to the cooperative. The Commissioner's attempt to attribute gain to the corporation was unsuccessful, for the Supreme Court upheld the determination of the Court of Claims that the sale of the assets was made by the shareholders and not by the corporation.

These two significant cases reveal that in the field of taxation the result often turns upon the "Word", as L. Hand pointed out in Ungar. The trap for the unwary was mitigated by the passage of section 337, which provided that no gain or loss was to be recognized on sales or exchanges of property which occur within twelve months *after* the adoption of a plan of complete liquidation, even if the sale be consummated by the corporation. See Bittker, Federal Income Taxation of Corporations and Shareholders 285–93

(1959). But, even though that section mitigates the *effects* of attributing income to the corporation, it does not overturn the holding of the Court and Cumberland cases in resolving the question *"To whom* is the income attributable, the shareholders or the corporation?" See Stephen S. Townsend, 37 T.C. 830, 837 & n. 2 (1962). The answer to that question is still relevant where, as here, the corporate taxpayer has not complied with the letter of section 337, as is conceded by the appellant. Those cases instruct us that when a corporation liquidates prior to a sale of assets by its shareholders, no income is attributed to the corporation.

The appellant also urges that since, at the time United assigned its claim to the proceeds of the condemnation sale, the value of the Washington Square property was wholly conjectural, United should be relieved of the burden of taxation.[6] The sheer weight of the case law, however, makes this contention unsupportable. In J. Ungar, Inc. v. Commissioner, supra, the amount of compensation to be received by the sole shareholder for the services performed by the former corporation was wholly contingent, for no commissions were to be paid unless and until the exporter shipped the goods specified in the unfilled orders. In Donner v. Commissioner, supra, the corporation's sales agent would have to find purchasers for the parcels of real property in order for income to be realized; yet the income from all sales after liquidation were attributed to the corporation. The hornbook teaching of Helvering v. Eubank, supra, hardly lends support to the appellant, for even there the amount of renewal commissions received by the

6. We are cited to Cold Metal Process Co. v. Commissioner, 247 F.2d 864 (6th Cir. 1957). There, the taxpayer distributed to its shareholders certain patents, the validity of which was in litigation, and large amounts of royalties impounded by the court pending the outcome of the case. That case is clearly distinguishable from that before us, however, for there the very validity or existence of the claim to proceeds was in question, and not merely the precise money value of an existing

and uncontested right. In short, the corporation was held not to have "earned" the income from the patent, whereas here there is no doubt that the proceeds from the sale of the Washington Square property had been "earned" by United. See Novo Trading Corp. v. Commissioner, 113 F.2d 320 (2d Cir. 1940); United Mercantile Agencies, 34 T.C. 808 (1960); Lyon & Eustice, "Assignment of Income," 17 Tax L.Rev. 293, 405–09 (1962).

transferee was wholly dependent upon the variable of policy renewals (even though the commissions had been "earned" prior to the assignment, as in Ungar). See also United States v. Lynch, 192 F.2d 718 (9th Cir. 1951), cert. denied, 343 U.S. 934, 72 S.Ct. 770, 96 L.Ed. 1342 (1952) (market value of apples, distributed to shareholders as ordinary dividend, conjectural); Heyman v. Commissioner, 176 F.2d 389 (2d Cir.), cert. denied, 338 U.S. 904, 70 S.Ct. 306, 94 L.Ed. 557 (1949) (recovery on outstanding patent and contract claims, conjectural); Commissioner of Internal Revenue v. First State Bank of Stratford, 168 F.2d 1004 (5th Cir.), cert. denied, 335 U.S. 867, 69 S.Ct. 137, 93 L.Ed. 412 (1948) (expectation of collectibility of bad debts assigned by corporation to shareholders, conjectural).

The appellant's final argument in support of its contention that United successfully transferred the incidence of taxation on the December 3 condemnation payment lies in a purported distinction between such cases as Lucas v. Earl, Horst, Eubank, and Ungar. Those cases are said to involve the assignment of the right to receive amounts which would be taxable to the transferor as ordinary income, while the proceeds in the case before us would be taxable to United as capital gain. This distinction is not only inoperative in the relevant case law, but it is also without any relevance in reason to the issue of *who* must pay the tax.

 There are many cases which compel the conclusion that a corporation is taxable on the proceeds of capital assets after the distribution to shareholders of claims to those proceeds. In Doyle v. Commissioner, 147 F.2d 769 (4th Cir. 1945), involving the transfer of an interest in a successfully litigated claim against the United States, the court held the individual transferor taxable on proceeds later received by his transferee, stating "Nor does it derogate from this holding that what he had, and transferred, he regarded technically as a capi-

tal asset or as being included under the elusive term, property." 147 F.2d at 772. In Heim v. Fitzpatrick, 262 F.2d 887 (2d Cir. 1959), where the individual taxpayer sold his invention and any patents that might be issued on it to a third person, and later made a gift to his family of various substantial rights he had retained, this Court intimated that had the taxpayer assigned to his family merely the right to receive royalties on the patent, he would have been taxable on the royalties received.[7] 262 F.2d at 890. If the imprimatur of the Supreme Court is deemed necessary in support of the Commissioner's contention that the proceeds from the sale of capital assets may be taxable to the transferor corporation, we have such in the case of United States v. Joliet & Chicago R. R., 315 U.S. 44, 62 S.Ct. 442, 86 L.Ed. 658 (1942), where a corporation, which in effect sold land (by a "lease in perpetuity") and provided for annual payments to the shareholders proportionate to their interests in the corporation, was held taxable "[f]or the rental or purchase payments for the property." The Court did not seem troubled by any purported distinction between rental income and sales proceeds. See Commissioner of Internal Revenue v. Transport Trading & Terminal Corp., 176 F.2d 570 (2d Cir. 1949), cert. denied, 339 U.S. 916, 70 S.Ct. 566, 94 L.Ed. 1341 (1950) (assignment of shares in a corporation, to which shares were attached an option to sell; assignor held taxable upon proceeds of later sale by assignee at purchase price wholly undetermined at date of assignment). Cf. Donner v. Commissioner, supra; First Nat'l Bank of St. Elmo v. United States, 194 F.2d 389 (7th Cir. 1952).

Independently of these cases, we can adduce no sound reason for taxing assigned income to the transferor but assigned proceeds of sales of capital assets to the transferee. One commentator has noted that so long as the right to income arises prior to the dissolution of the corporation, the corporation should be tax-

---

7. But compare Commissioner of Internal Revenue v. Reece, 233 F.2d 30 (1st Cir. 1956).

able whether there be a capital gain or merely an increment in ordinary income. In both cases, all that is transferred is the right to compensation; the distributees of the corporate claim have no equitable interest in the property sold, and the case therefore falls without the principle of Blair v. Commissioner. Farer, "Corporate Liquidations: Transmuting Ordinary Income Into Capital Gains", 75 Harv.L.Rev. 527, 534–35 n. 26 (1962). The corporation exercises the same control over the disposition of the proceeds of the sale as did the individual taxpayers in Lucas v. Earl, Horst, and Eubank. See Stephen S. Townsend, 37 T.C. 830 (1962) (assignment of proceeds from sale of stock); T. J. Rogers, 15 B.T.A. 638, 640–41 (1929).[8]

### III.

We are told by the appellant that even though United might not have escaped taxation merely by transferring the claim to the condemnation proceeds, no tax may be levied here because at the time the proceeds were received, the corporation had already terminated its existence by transferring its assets to the Commercial State Bank. But United retained a bank account in order to meet liabilities after liquidation, and there was more than $1,000 in the account on December 3, 1956. We therefore rest upon Judge Dawson's application, 206 F.Supp. 773, 776 (S.D.N.Y.1962), of the principle established by this Court in the Ungar case, and hold that since United retained these assets its existence was not terminated and it was liable for the tax on the proceeds of the condemnation sale when received by its shareholders.[9]

The judgment below is affirmed.

---

8. See 15 B.T.A. at 640–41:
 "At the instant of the consummation of the sale the obligation of the vendor to pay a tax on any profit derived became fixed. The fact that the vendor directed that the notes * * * be made payable to a third party is immaterial and could not affect or lessen the obligation of the vendor to account for all profits on the transaction. It follows that what was conveyed to the * * * [donees] was a right to collect and retain the deferred payments, but the obligation of the vendor to pay tax on all profits, being fixed at the time of sale, was not reduced by this gift of the unpaid proceeds."

9. For all of these reasons, the appellant is taxable both on the principal amount of $129,166.67 received on December 3, 1956, and the corresponding interest of $12,131.51.