TRIBORO COACH CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 61905. Filed March 31, 1958.

*Bernard Shatzkin, Esq.,* and *Bernard Wexler, Esq.,* for the petitioner.

*James E. Markham, Jr., Esq.,* for the respondent.

TIETJENS, *Judge:* The respondent determined a deficiency in income and excess profits tax of $76,652.78 for the fiscal year ended June 30, 1952, and a 5 per cent addition to the tax for late filing, amounting to $3,832.64. The principal issue is whether an amount credited to the petitioner in the taxable year is includible in gross income for that year or was accruable in earlier years. By amendment to the petition there is raised the alternative contention that if the amount is, for income tax purposes, includible in gross income in the taxable year it is abnormal income within the provisions of section 456 of the Internal Revenue Code of 1939 for excess profits tax purposes. Some facts are stipulated.

FINDINGS OF FACT.

The stipulated facts are incorporated by this reference.

Triboro Coach Corporation was incorporated under the laws of New York. Its principal office is in New York City. It prepares its corporation income tax returns on an accrual basis and for fiscal years ended June 30. Its return for the fiscal year ended in 1952 was filed with the director of internal revenue at Brooklyn, New York.

Triboro operates omnibuses in the borough and county of Queens, city and State of New York. It operates these vehicles pursuant to a contract with the City of New York and a certificate of convenience and necessity issued by the State Public Service Commission. It keeps its books and records on an accrual basis and in accordance with the system of Uniform Accounts prescribed by the commission. Under the State Public Service Law the power to determine the rate of fare Triboro may charge is vested in the City.

At all times here material the subway and elevated railway lines in the City were owned by the City and operated on its behalf by the Board of Transportation, an administrative agency, herein referred to as the Board.

From July 1, 1948, to July 1, 1952, Triboro's system was closely integrated with the City's rapid transit lines and intersected them at a number of points. During this period passengers from either Triboro's lines or the City's were permitted to transfer to the others' lines without additional fare by purchasing what was known as a "combination ride."

Under an agreement dated June 30, 1948, Triboro agreed to sell to its passengers for 7 cents a ticket good for a ride on City-owned lines, to pay over to the Board the money received for such tickets, and to accept, as the equivalent of 5 cents from its passengers, tickets issued by the Board to passengers transferring from City-owned lines to Triboro's routes. Such tickets were to be sold by the Board for 2 cents each but the Board was to pay Triboro 5 cents for each such ticket collected. Triboro was to pay the costs of providing tickets and accounting for them and the Board agreed to reimburse Triboro for expenses incurred in printing, selling, collecting, and accounting for such combination rides by paying Triboro a service charge of one-half cent for each combination rider carried on the City's rapid transit lines.

During the fiscal years ended in 1949 and 1950, Triboro carried 18,612,538, and 18,842,679 combination riders, respectively. During the fiscal year ended in 1952 Triboro carried 18,112,825 combination riders.

The City subway fare was 10 cents during the period July 1, 1948, to June 30, 1952. The bus fare and combination fare, the division of the

combination fare, and the service charges authorized during this period were as follows:

| | Bus fares | Combination fare | City portion | Company portion | Service charge |
|---|---|---|---|---|---|
| | | | *Cents* | | |
| July 1, 1948 | 5 | 12 | 7 | 5 | ½ |
| Sept. 20, 1948 | 6 | 12 | 7 | 5 | ½ |
| Nov. 12, 1948 | 7 | 12 | 7 | 5 | ½ |
| July 1, 1950 | 8 | 15 | 8 | 7 | ([1]) |
| Jan. 1, 1951 | 10 | 15 | 8 | 7 | ([1]) |

[1] None.

Triboro found the service charge insufficient to meet the expenses of printing, selling, collecting, and accounting for the combination ride tickets. In September 1948, Triboro sought an increase in the service charge. This was not granted at that time.

From November 12, 1948, to January 9, 1949, Triboro did not perform the functions of printing, selling, collecting, and accounting for combination riders and those functions were performed by the Board, Triboro agreeing to reimburse the Board for the costs and expenses so incurred. Pursuant to this arrangement the Board on March 3, 1949, billed Triboro for $37,650.19. This related to services in connection with 2,860,815 combination riders or 1.316 cents per rider.

In March of 1949 representatives of the City offered to increase the service charge allowed Triboro to 1 cent, to be retroactive to July 1, 1948. Triboro did not accept at that time and urged that the allowance should be increased to 1½ cents. The service charge was eliminated after June 30, 1950. In June 1951, Triboro agreed to accept the offer of March 1949, to allow it an additional one-half cent per rider for the period July 1, 1948, to June 30, 1950.

On June 28, 1951, the Board of Estimate of the City adopted resolution No. 66, amending a prior resolution authorizing private bus companies to charge certain rates of fare, to extend the authority to December 31, 1951, and also to provide that Triboro should be paid 8 cents of the 15-cent combination ride fare. This was a larger portion than that allowed the other independent bus companies. These received 7 cents of the 15-cent fare.

The intent of this arrangement as to Triboro was explained by the First Deputy Comptroller of the City as follows:

With the establishment of the "combination fare," all of the private operators in Queens were seriously affected because of the large number of "combination fare" riders. All of the Queens operators petitioned the Board of Estimate for additional relief because they did not receive the full benefit of the fare increase with the result they all suffered operating losses.

In the case of the Triboro Coach Corporation, more than 60% of the passengers carried during the period July 1, 1948 to June 30, 1950 were "combination fare" riders with the result that this company's operating losses were greater and the relief granted the other Queens operators would be insufficient to cover losses incurred during July 1, 1948 to June 30, 1950.

Because of many problems that arose as to how an adjustment could be made to offset prior years operating losses, an adjustment in the division of the 15¢ "combination fare" was made effective July 1, 1951, so that the company's share would be 8¢ instead of 7¢. This was intended to give the Triboro Coach Corporation an additional one-half cent (½¢) for each "combination fare" rider carried during the period July 1, 1948 to June 30, 1950, but in no event to exceed the amount that one cent (1¢) would give the company for each "combination fare" rider carried during the fiscal period July 1, 1951 to June 30, 1952.

On July 31, 1951, Triboro and the Board of Transportation executed an agreement which settled the amount owing by Triboro to the Board, and provided for applying settlements on future interchanges of transfers to reduce this debt until it was paid in full.

In the fiscal year ended June 30, 1952, Triboro received credit for $181,128.28 against its indebtedness to the Board.

#### OPINION.

In the taxable year, the fiscal year ended June 30, 1952, Triboro received 8 cents of the 15-cent fare for carrying combination riders while the other privately owned bus companies received only 7 cents. This additional cent per rider amounted to $181,128.28.

Triboro, an accrual basis taxpayer, filed amended returns for the fiscal years ended in 1949 and 1950, allocating this sum to those years on the theory that its right arose pursuant to a commitment by the City in March 1949 to pay an additional one-half cent per rider for the combination riders carried from July 1, 1948, to June 30, 1950, and that the income should have been accrued at that time. The respondent determined that the sum was includible in gross income for the fiscal year ended in 1952 and not accruable earlier.

Triboro had found the one-half cent service charge inaugurated July 1, 1948, to be inadequate to meet the cost of accounting for combination riders and from September 1948 had sought an increase in the allowance. When the Board of Transportation took over this function for a few weeks it found the cost to it was 1.316 cents per rider. In March 1949 the Board recognized that one-half cent was inadequate and offered an increase in the service charge to 1 cent, retroactive to July 1, 1948. Triboro asked for more, but this was refused. The service charge was discontinued after June 30, 1950. In June 1951 Triboro agreed to accept the increase previously offered. By this time no allowance was made for this service and another means of compen-

sating Triboro had to be devised. The arrangement made by the City to reimburse Triboro was to allow the latter an extra cent in the division of combination fares for 1 year. This would supposedly be equal to an extra one-half cent for the 2 years from July 1, 1948, to June 30, 1950.

The general counsel for the City thought the State constitution prohibited adjustment by crediting Triboro with the additional amount and suggested compensating Triboro by allowance of 1 cent additional for the next year, the fiscal year ended in 1952.

Triboro's contention is that in March 1949, when the City agreed that the service charge allowed was inadequate and offered to increase it from one-half cent to 1 cent per rider, its right to this sum accrued and the allowance should have been accrued as income in the fiscal years 1949 and 1950 when the service charge was in effect, and therefore the amount should not be included in gross income in the fiscal year 1952. It is argued that Triboro realized an additional one-half cent whenever a combination rider boarded one of its buses after March 1949 until the service charge was ended on June 30, 1950. Had the City's offer been accepted at that time the credits would have been accrued and paid in the fiscal years 1949 and 1950. But Triboro did not accept until June 1951, after the service charge was abolished. Nevertheless, it is argued that after March 1949 Triboro had the right to receive the additional amount, and that the right to receive determines the accruability of the item by an accrual basis taxpayer, citing *Spring City Foundry Co.* v. *Commissioner*, 292 U. S. 182 (1934); *Continental Tie & Lumber Co.* v. *United States*, 286 U. S. 290 (1932); and *Cappel House Furnishing Co.* v. *United States*, 244 F. 2d 525 (C. A. 6, 1957).

In *Continental Tie & Lumber Co.* v. *United States, supra,* it was held that a taxpayer on an accrual basis should have accrued as income in 1920 an amount awarded and received in 1923 pursuant to the Transportation Act of 1920, the right to payment having ripened when the Act became law and the amount being ascertainable within reasonable limits from the date in the taxpayer's books and the calculations required by the statute, the action of the Interstate Commerce Commission in determining the amount and ordering payment of the award being deemed mere administrative procedure.

Where an item depends upon a contingency or future events, it may not be accrued until the contingency or events have occurred and fixed with reasonable certainty the fact and amount of the liability. *United States* v. *Safety Car Heating & Lighting Co.*, 297 U. S. 88 (1936); *Lucas* v. *American Code Co.*, 280 U. S. 445 (1930). Where liability is substantially in controversy, accrual must await the resolution of the

controversy. *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281 (1944); *Dixie Pine Products Co.* v. *Commissioner*, 320 U. S. 516 (1944); *Atlantic Coast Line Railroad Co.*, 4 T. C. 140 (1944).

In *Cappel House Furnishing Co.* v. *United States, supra*, an accrual basis taxpayer had its business interrupted by a fire. It carried business interruption insurance measured by gross earnings. The claim was settled and paid and returned as income in a later taxable year. The Court of Appeals for the Sixth Circuit upheld the Commissioner's determination that the recovery should have been accrued as of the time of the interruption of the business.

In the *Cappel* case and in the *Continental Tie & Lumber Co.* case, the taxpayer was entitled by law or by contract to receive certain moneys. Although the exact amount was not fixed it was ascertainable with reasonable certainty and the *right* to receive it was not substantially in controversy.

This is not the situation here. Although certain City officials expressed oral agreement that the service charge ought in fairness to be increased and offered to allow an additional half cent per rider, that offer was not accepted during the years in which the service charge was in effect. There was no official action taken by the City. There was then no legal obligation entitling Triboro to receive these amounts. It did not have the *right* to receive them which is the basis justifying and requiring an accrual of income. *Jamaica Water Supply Co.*, 42 B. T. A. 359, affd. 125 F. 2d 512 (C. A. 2, 1942); *Midwest Motor Express, Inc.*, 27 T. C. 167 (1956), on appeal (C. A. 8). The respondent was correct in determining that the additional 1 cent per rider allowed Triboro in the taxable year was accruable only in the fiscal year ended in 1952.

Triboro contends in the alternative that if this allowance is income in the fiscal year 1952, it is "abnormal income" arising out of a claim, award, judgment or decree within the meaning of section 456,[1] I. R. C. 1939, and therefore exempt from excess profits tax.

---

[1] SEC. 456. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

(1) ABNORMAL INCOME.—The term "abnormal income" means income of any class described in paragraph (2) includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 115 per centum of the average amount of the gross income of the same class for the four previous taxable years, or, if the taxpayer was not in existence for four previous taxable years, the taxable years during which the taxpayer was in existence.

(2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income:

(A) Income arising out of a claim, award, judgment, or decree, or interest on any of the foregoing; or

\* \* \* \* \* \* \*

(3) NET ABNORMAL INCOME.—The term "net abnormal income" means the amount of the abnormal income less, under regulations prescribed by the Secretary, (A) 115

The purpose of section 456 was to relieve the burden of the excess profits tax in cases where income is received in the taxable year which is inherently abnormal in character and amount and is attributable to other years. See *W. B. Knight Machinery Co.*, 6 T. C. 519, 529.

The respondent argues that Triboro had no claim, that it simply sought a rate increase and prior to the resolution of the Board of Estimate in June 1951 had no color of right to the amount subsequently credited to it on this account, which was earned under the new contract.

It is clear from the testimony that Triboro was pressing a request for an increased allowance for the performance of the functions for which the service charge was provided. It had evidence that the cost was approximately 1.3 cents per rider and argued for an allowance of 1½ cents. There was at least a dispute or an asserted demand sufficient to constitute a "claim." See *Yuba Gardens, Inc.*, 17 T. C. 334, 343. The First Deputy Comptroller's explanation of the allowance granted in the taxable year shows that it was intended to compensate Triboro for the accounting services performed in the fiscal years 1949 and 1950. This item was not allowed to other bus operators in the taxable year and hence was abnormal to Triboro. It was abnormal for Triboro to receive income of this class. The income was clearly attributable to the fiscal years 1949 and 1950 in view of the First Deputy Comptroller's statement. These years were not taxable years for purposes of the excess profits tax. We sustain Triboro on this point.

The applicable regulations require a taxpayer claiming the benefits of section 456 to furnish certain information with its return, for the purpose of a computation. Triboro raised this alternative issue in an amendment to the petition, filed pursuant to leave granted at the hearing, and asserts that the necessary data is in the record from which a computation can be made in the event we hold the income was abnormal. We so hold. Accordingly,

*Decision will be entered under Rule 50.*

---

per centum of the average amount of the gross income of the same class determined under paragraph (1), and (B) an amount which bears the same ratio to the amount of any costs or deductions relating to such abnormal income, allowable in determining the normal-tax net income for the taxable year, as the excess of the amount of such abnormal income over 115 per centum of such average amount bears to the amount of such abnormal income.

(b) AMOUNT ATTRIBUTABLE TO OTHER YEARS.—The amount of the net abnormal income that is attributable to any previous or future taxable year or years shall be determined under regulations prescribed by the Secretary. * * *