BEAUTY ACQUISITION CORPORATION, JACK S. LEVIN, RECEIVER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Beauty Acquisition Corp. v. Commissioner
Docket No. 21750-93
United States Tax Court
T.C. Memo 1995-87; 1995 Tax Ct. Memo LEXIS 92; 69 T.C.M. (CCH) 1971; March 2, 1995, Filed *92 For petitioner: Jack S. Levin, Raymond P. Wexler, Todd F. Maynes, and Robert T. Smith. For respondent: Stephen C. Best, John Aletta, and Bradford A. Johnston. WELLS
WELLS
MEMORANDUM OPINION WELLS, Judge: The instant case [1] is before the Court on petitioner's motion for summary judgment under Rule 121. We must decide whether petitioner's distribution ot its shareholders of a disputed claim for specific performance of a contract petitioner had entered into with Revlon, Inc., qualifies for nonrecognition treatment under either section 336 or 337 as in effect before the effective date of the Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and *93 Procedure. Respondent determined a deficiency in Beauty Acquisition Corp.'s (BAC's) Federal income tax for its taxable year ended October 2, 1986, in the amount of $ 20,700,000 and an addition to tax under section 6651(a)(1) in theamount of $ 5,175,000. The majority of facts regarding the formation and dissolution of BAC are undisputed. For purposes of deciding the instant motion, we adopt respondent's statement of uncontested and material facts. On October 1, 1985, BAC was incorporated under the laws of the State of Delaware to serve as the corporate vehicle for acquiring and operating the assets of the Beauty and Fragrance Division (the RBFD) of Revlon, Inc. (Revlon). BAC issued 100 shares of stock to Adler & Shaykin (A&S), a general partnership formed under the laws of the State of New York. The stock was issued for a total of $ 100 ($ 1 per share). A&S was BAC's only shareholder of record. BAC elected a board of directors and appointed officers, including Ms. Linda Wachner, as its chief executive officer. On October 3, 1985, BAC entered into an asset purchase agreement (the RBFD contract) with Revlon to purchase the RBFD for $ 875,000,000 in cash plus the assumption of *94 $ 30 million in liabilities. Section 6.2 of the RBFD contract states as follows: In the event of a termination of this Agreement by either Buyer or Seller as provided above, this Agreement will forthwith become void and there will be no liability on the part of either Buyer or Seller, except for breaches of this Agreement prior to the time of such termination and except as otherwise provided in section 8.05 and section 8.16 which shall survive the termination. Section 8.16 of the RBFD contract states as follows: The parties agree that the assets of the * * * [RBFD] are unique and that Buyer is entitled to specific performance of this Agreement. In consideration of the execution of this Agreement by Buyer, Seller agrees that, if a court refuses to grant Buyer specific performance of this Agreement against Seller, Seller wil promptly deliver to buyer $ 20 million in immediately available funds as a break-up fee. Buyer's right to receive payments pursuant to section 8.16 is in addition to, and not in lieu of derogation of, Buyer's right to seek specific performance under this Agreement. Upon execution of the RBFD contract, BAC began a due diligence review of the RBFD and *95 also negotiated with Equitable Life Assurance Society of the United States (Equitable), Bankers Trust Co. (Bankers Trust), and Manufacturers Hanover Trust (Manufacturers Hanover) to secure the financial commitments that BAC needed to acquire the RBFD. On November 5, 1985, Pantry Pride, Inc. (Pantry Pride), successfully acquired all of the stock of Revlon. Shortly thereafter, a dispute arose over the terms of the RBFD contract, and, on November 19, 1985, BAC brought suit against Revlon in a Delaware court. In its complaint, BAC sought specific performance of the RBFD contract. The complaint alleged that, after Pantry Pride acquired control of Revlon on November 5, 1985, Revlon breached the RBFD contract by taking actions which BAC believed were designed to prevent it from consummating the purchase of the RBFD. On December 6, 1985, Revlon filed an answer to the complaint alleging that the RBFD contract was not a binding agreement because it contained material ambiguities, and furthermore, that BAC lacked the financing to complete the acquisition of the RBFD, even if the contract were binding. On December 14, 1985, A&S and Equitable entered into an agreement to share the expenses *96 of BAC's litigation against Revlon. The agreement contained a formula for determining Equitable's share of any damage award or recovery received by BAC from its suit against Revlon. BAC was unable to complete the acquisition of the RBFD on December 26, 1985. On January 15, 1986, BAC filed an amended and supplemental complaint in the Delaware court seeking specific performance of the RBFD contract and monetary damages in the alternative. On Febraury 4, 1986, Revlon filed an amended answer to BAC's amended complaint, denying BAC's allegations regarding BAC's request for specific performance or monetary damages. During the spring of 1986, representatives from Revlon and BAC began settlement discussions regarding the payment of money damages to BAC. Mr. Howard Gittis, vice chairman of Revlon, was the primary representative for Revlon in the settlement discussions with BAC. Mr. Frederick R. Adler, an officer and director of BAC and a general partner in A&S, was the primary representative of BAC and A&S in the settlement negotations with Revlon. Mr. Fred N. Fishman, an attorney representing Equitable, was also prominent in the negotiations. Others who participated in the negotiations *97 included Mr. Brian F. Wruble, president of Equitable, Mr. Robert C. O'Brian, a managing director of Bankers Trust, Mr. Stuart L. Shapiro, an attorney representing Revlon, and Mr. Stephen R. Steinberg and Mr. Jack S. Levin, attorneys representing BAC. [2]
Representatives of the various parties exchanged draft settlement agreements dated May 7, 1986, and May 14, 1986. The parties also exchanged a draft letter dated May 14, 1986, relating to the indemnification by A&S and BAC with respect to any claims A&S and BAC might have had against Equitable, Bankers Trust, and Manufacturers Hanover. On June 20, 1986, Mr. Fishman sent a letter to Mr. Wruble, Mr. Adler, and Mr. Leonard Shaykin (a *98 general partner in A&S) enclosing a proposed settlement agreement dated June 19, 1986 (the proposed settlement agreement). The proposed settlement agreement stated that Equitble was to be paid $ 15,250,000 in exchange for settling any claims it had against Revlon relating to BAC's acquisition of the RBFD. The proposed settlement agreement, in part, provides as follows: 1. Payment to Equitable. Simultaneously with the execution of this Agreement, Revlon Group is delivering to Equitable a check payable to its order in immediately available funds in New York, N.Y. in the amount of $ 15,250,000. 2. Effect of Settlement on the Litigation. (a) The settlement provided for herein shall have no effect on the right of BAC to have commenced and to continue to prosecute the Litigation or to seek specific performance and damages exclusively for the benefit of BAC and the parties having interests therein other than Equitable and its subsidiaries, or on the right of any party other than Equitable and its subsidiaries to bring any other action with respect to the Asset Purchase Agreement or any claim relating thereto. (b) If in the course of the Litigation BAC is judicially awarded *99 damages (as a break-up fee or otherwise), the amount of damages to be paid pursuant to such award shall be reduced as set forth below, and any such damages shall be deemed satisfied and discharged by payment of such reduced amount: (i) the first $ 20,000,000 of such award shall be reduced by an amount equal to 35% of such award and by an amount equal to 40% of the attorneys' fees and other out-of-pocket expenses of the Litigation included in such award which were * * * [incurred] by BAC, A&S and its affiliates, and Equitable and its subsidiaries to and including the date of this Agreement, and (ii) the amount of such award over $ 20,000,000 shall be reduced by an amount equal to 40% of such amount over $ 20,000,000 and by an amount equal to 40% of the attorneys' fees and other out-of-pocket expenses of the Litigation included in such award which were * * * [incurred] by BAC, Equitable and its subsidiaries and A&S and including the date of this Agreement. On June 23, 1986, Mr. Shapiro sent a letter to Mr. Fishman enclosing a revised draft of the June 19, 1986, proposed settlement agreement (the first revision). Section 2 of the first revision provides as follows: 2. Effect *100 of Settlement on the Litigation. (a) Unless BAC and A&S opt into this Agreement pursuant to Paragraph 4 below, the settlement provided for herein shall have no effect on the right of BAC to have commenced and to continue to prosecute the Litigation or to seek specific performance and damages exclusively for the benefit of BAC and the parties having interests therein other than Equitable, its affiliates and subsidiaries, or on the right of any party other than Equitable, its affiliates and subsidiaries to bring any other action with respect to the Asset Purchase Agreement or any claim relating thereto. The language of section 2(b) of the first revision is similar to the language contained in the proposed settlement agreement. Section 4 of the first revision, in pertinent part, provides as follows: 4. BAC Option. (a) For a period of 60 days from the date hereof, A&S and BAC shall be entitled to opt into this settlement and to receive from Revlon Group a check payable to its order in immediately available funds in New York, N.Y. in an amount equal to $ 19,300,000 and releases from the Revlon Entities in a form substantively identical to the release described in Paragraph *101 6 below. As consideration for such payment and releases, BAC, A&S and their subsidiaries and affiliates shall grant releases substantively identical to those granted by Equitable and described in Paragraph 5 below. As further consideration for such payment, BAC and A&S shall execute all papers and take all other steps as may be required to cause the Litigation to be dismissed with prejudice with each party to bear its own costs. As consideration for the right to opt into this agreement being extended to BAC and A&S, BAC and A&S hereby agree to a suspension of all activity in the Litigation for a period of 60 days from the date hereof. The first revision provided that Equitable was still to be paid $ 15,250,000 for settling any claims it had against Revlon. On June 27, 1986, Mr. Fishman sent a letter to the various representatives of the parties enclosing another draft of a settlement agreement (the second revision) in which payment to Equitable was increased by $ 250,000 to a total of $ 15,500,000 and payments to Bankers Trust and Manufacturers Hanover were listed as totaling $ 6 million. BAC and A&S were again given 60 days to opt into the settlement. In the second revision, *102 the amount that would be paid to BAC and A&S should they decide to opt into the settlement was left blank. On June 28, 1986, a draft of a document entitled "Bank Release" was exchanged among the representatives of the various parties, wherein Bankers Trust and Manufacturers Hanover agreed to release their claims against Revlon for a total of $ 6 million. On July 10, 1986, BAC, on the advice of its tax counsel, adopted a plan of complete liquidation pursuant to section 337 of the Internal Revenue Code and section 275 of the Delaware General Corporation Law. Mr. Fishman sent Mr. David M. Benrick and Mr. Kevin R. Evanich, tax counsel for BAC, a proposed settlement agreement dated July 21, 1986 (the third revision). The third revision was marked to show changes made on the second revision. The third revision provided that Equitable was to be paid $ 15,500,000 and payments to Bankers Trust and Manufacturers Hanover were to total $ 6 million. In the third revision, as in the second revision, BAC and A&S were given the right to opt into the settlement agreement and the amount to be paid to them if they exercised the option was again left blank. On August 7, 1986, Mr. Fishman sent *103 a letter to representatives of the various parties enclosing another proposed settlement agreement (the fourth revision). The fourth revision was marked to show changes from the third revision. The fourth revision provided that Equitable was still to receive $ 15,500,000 and payment to Bankers Trust and Manufacturers Hanover was still to total $ 6 million. In the fourth revision, BAC and A&S were given the right to opt into the settlement for $ 19,750,000. On August 13, 1986, Mr. Fishman sent a letter to Mr. Adler of A&S concerning the sharing of litigation expenses and settlement proceeds from the RBFD litigation and enclosed a draft of a proposed agreement to release Equitable from its obligation to bear further litigation expenses after it agreed to a settlement with Revlon. On August 26, 1986, Mr. Fishman wrote a letter to Mr. O'Brian of Bankers Trust in which Mr. Fishman states: At the request of Leonard P. Shaykin of Adler & Shaykin, I enclose a copy of the draft of August 7, 1986 of the proposed Settlement Agreement. I do not have as yet a complete sign-off, but I do not believe that the principal thrust of the arrangement would be affected by changes. Revlon's position *104 is that the amount in Paragraph 1 would be $ 15,300,000 and the amount in Paragraph 3 would be $ 19,450,000. * * * I also enclose copies of drafts dated August 26, 1986 of proposed Releases from Bankers Trust Company and Manufacturers Hanover Trust Company with respect to the contemplated payment by Revlon Group, Inc. On August 29, 1986, Mr. Fishman sent a letter to Mr. Wruble, Mr. Miller, Mr. Adler, Mr. Shaykin, and Mr. Levin, enclosing copies of pages 1, 2, 4, and 5 of the fourth revision, which were marked to show additional revisions of the agreement. Mr. Fishman's letter also stated: "Mr. Shapiro said that, because of a tax factor, the Revlon interests do not want the BAC option to be exercisable until October; he noted that the change still permitted exercise up to about 60 days from the present". On September 10, 1986, Revlon and BAC executed an agreement providing that BAC's liquidation would not prejudice BAC's rights in its lawsuit against Revlon and its affiliated companies. Mr. Gittis, in a deposition conducted during a lawsuit between Ms. Wachner and A&S, stated that Revlon consented to BAC's liquidation for the following reasons: I was told that it was very *105 helpful to the plaintiff from a tax standpoint, and everything I could do to facilitate the settlement I wanted to do. I wanted to settle the case. I didn't want to be in a position * * * [of] going forward with our customers, with personnel that we wanted to hire, a whole variety of business instances, that this litigation continue. By September of 1986, we already acquired Max Factor, Almay and Halston. We were in the process of intermingling those assets with the Revlon assets. From my standpoint, anything I could do to make this case settle I wanted to do. If this was going to help them from a tax standpoint, it wasn't going to cost me anything, so I might as well do it. Mr. Gittis also stated during the course of the deposition that he never believed that the case would go to trial. On September 15, 1986, Mr. Fishman sent a letter to Mr. Gittis enclosing six copies of the fourth revision. In his letter, Mr. Fishman requested that Mr. Gittis execute the fourth revision on behalf of the Revlon Group. On September 23, 1986, Mr. Fishman wrote to Mr. Wruble and enclosed six undated copies of the fourth revision that had been executed by Mr. Gittis on behalf of the Revlon *106 Group. On September 29, 1986, BAC distributed its only asset, its claim against Revlon under the RBFD contract, to A&S in its capacity as agent for the holders of interest in BAC. On October 2, 1986, BAC formally dissolved. On October 3, 1986, a certificate of dissolution was filed on behalf of BAC with the Office of the Secretary of State of Delaware. On October 27, 1986, Revlon entered into settlement agreements with Equitable, Bankers Trust, and Manufacturers Hanover, in which Revlon agreed to pay $ 15,300,000 to Equitable, $ 3 million to Bankers Trust, and $ 3 million to Manufacturers Hanover in exchange for their settling any claims they had against Revlon arising out of the RBFD contract. The October 27, 1986, settlement agreement contained a provision which gave A&S, as the agent for the holders in interest in BAC, a 60-day option to join the settlement and to receive payment in the amount of $ 19,450,000. During the 60-day period, the parties agreed to refrain from pursuing the litigation. On December 2, 1986, Revlon and A&S, as agent for the holders of interest in BAC, entered into a settlement agreement providing for Revlon to pay $ 23,700,000 to A&S in exchange for *107 the agreement of A&S to end its litigation with Revlon. On that same day, A&S received the settlement payment from Revlon. Respondent mailed a notice of deficiency to BAC, in care of A&S, on July 13, 1993. In the notice of deficiency, respondent determined that BAC, during its taxable year ended October 2, 1986, received a $ 45 million [3] breakup fee (the settlement payments) that was not reported on its Federal income tax return and that the nonrecognition provisions of sections 336 and 337 did not apply. Accordingly, respondent increased BAC's income for its year ended October 2, 1986, by $ 45 million. Respondent also determined an addition to tax under section 6651(a)(1) in the amount of $ 5,175,000 for failure to timely file a Federal income tax return. *108 Summary judgment is appropriate in a case only when it is shown by the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable evidence that "there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law". Rule 121(b); Naftel v. Commissioner, 85 T.C. 527, 529 (1985). Petitioner, as the moving party, bears the burden of proving that there is no genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Jacklin v. Commissioner, 79 T.C. 340, 344 (1982); Espinoza v. Commissioner, 78 T.C. 412, 416 (1982). The moving party may discharge its burden by proving that "there is an absence of evidence to support the nonmoving party's case". Celotex Corp. v. Catrett, supra at 325. For purposes of summary judgment, inferences drawn from the facts on which the moving party relies are to be resolved in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); *109 Naftel v. Commissioner, supra at 529; Hoeme v. Commissioner, 63 T.C. 18, 20 (1974) (citing United States v. Diebold, Inc., 369 U.S. 654 (1962)). If there exists sufficient doubt as to the facts in issue, a motion for summary judgment must be denied. Espinoza v. Commissioner, supra at 416. The nonmoving party is not required to negate the moving party's claims, but merely to show there is a genuine issue for trial. Celotex Corp v. Catrett, supra at 323-324. "Summary assertions and conclusory allegations [by the nonmoving party] are simply not enough evidence to raise a genuine issue of material fact." Daniels v. Commissioner, T.C. Memo. 1994-591. Summary judgment may be granted "If the evidence [proffered by the nonmoving party] is merely colorable * * * or is not significantly probative". Anderson v. Liberty Lobby, Inc., supra at 249-250. In pertinent part, Rule 121(d) provides: When a motion for summary judgment is made and supported as provided *110 in this Rule, an adverse party may not rest upon the mere allegations or denials of such party's pleading, but such party's response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, then a decision, if appropriate, may be entered against such party. In the instant case, respondent contends, inter alia, that the assignment of income doctrine overrides BAC's "purported" liquidation under section 336, and that the settlement payments, therefore, constitute taxable income to BAC. Petitioner argues that the assignment of income doctrine overrides the nonrecognition provision of section 336 only when the corporation has a "fixed and determinable right to the income" at the time the income or property is distributed to the corporation's shareholders. Petitioner contends that BAC did not have a fixed and determinable right to the settlement payments when it distributed its only asset (the claim against Revlon on the RBFD contract) to its shareholders in exchange for the stock in BAC. Section 336 provides that a corporation recognizes neither gain nor loss on the *111 distribution of its assets in complete liquidation. [4] A corporation, however, may not escape corporate income tax by an anticipatory assignment of income to its shareholders, even though the assignment takes the form of a complete liquidation. See, e.g., Wood Harmon Corp. v. United States, 311 F.2d 918 (2d Cir. 1963); Williamson v. United States, 155 Ct. Cl. 279, 292 F.2d 524 (1961); J. Ungar, Inc. v. Commissioner, 244 F.2d 90 (2d Cir. 1957). Courts routinely have held that the assignment of income doctrine does not apply to a liquidating corporation that has not "earned" the income at the time of the distribution or that is no longer in "existence" when the potential income matures. See, e.g., United States v. Joliet & C.R.R., 315 U.S. 44 (1942); Hersloff v. United States, 159 Ct. Cl. 366, 310 F.2d 947 (1962); Cold Metal Process Co. v. Commissioner, 247 F.2d 864 (6th Cir. 1957); Commissioner v. Henry Hess Co., 210 F.2d 553 (9th Cir. 1954), *112 affg. in part and revg. in part 16 T.C. 1363 (1951); Schneider v. Commissioner, 65 T.C. 18 (1975); Shea Co. v. Commissioner, 53 T.C. 135 (1969); Poro v. Commissioner, 39 T.C. 641 (1963). For purposes of the assignment of income doctrine, a taxpayer is not considered to have "earned" an item of income until the taxpayer has "accrued" the income; i.e., the taxpayer has a fixed and determinable right to the income. Schneider v. Commissioner, supra at 26-27; Shea Co. v. Commissioner, supra at 156-157; see also Greene v. United States, 13 F.3d 577, 581-582 (2d Cir. 1994) (holding that the assignment of income doctrine applies only when the transferor of a futures contract has a "fixed right to the income"); Schneer v. Commissioner, 97 T.C. 643, 649-650 (1991) (Court-reviewed) (holding that, for purposes of the assignment of income doctrine, a taxpayer has "earned" income when the all-events test for accrual of income under section 1.451-1(a), *113 Income Tax Regs., has been satisfied). For a right to income to be fixed and determinable "there can be no substantial contingency to * * * [the] taxpayer's right of receipt or as to the certainty of the amount to be received". Schneer v. Commissioner, supra at 650. In the case of a contested claim, accrual is not proper until the dispute is resolved. See, e.g., Continental Tie & Lumber Co. v. United States, 286 U.S. 290 (1932); Breeze Corp. v. United States, 127 Ct. Cl. 261, 117 F. Supp. 404 (1954); Cold Metal Process Co. v. Commissioner, 17 T.C. 916 (1951); Rev. Rul. 73-385, 1973-2 C.B. 151; Rev. Rul. 60-237, 1960-2 C.B. 164. A dispute is resolved when the parties settle or when liability is finally determined and is not subject to further appeal or contest. See, e.g., United States v. Safety Car Heating Co., 297 U.S. 88 (1936); Maxus Energy Corp. v. United States, 31 F.3d 1135 (Fed. Cir. 1994); *114 H. Liebes & Co. v. Commissioner, 90 F.2d 932 (9th Cir. 1937); Breeze Corp. v. United States, supra; Snyder Air Prods., Inc. v. Commissioner, 71 T.C. 709 (1979); Triboro Coach Corp. v. Commissioner, 29 T.C. 1274 (1958); Foster Wheeler Corp. v. Commissioner, 20 T.C. 15 (1953); Ryan v. Commissioner, T.C. Memo. 1988-12, affd. sub nom. Lamm v. Commissioner, 873 F.2d 194 (8th Cir. 1989); Ameron, Inc. v. United States, 49 AFTR 2d 82-323 (C.D. Cal. 1980), affd. in an unpublished opinion (9th Cir. 1983); Rev. Rul. 79-278, 1979-2 C.B. 302. The fact that the parties expect the dispute to be resolved in the near future does not itself satisfy the test for the accrual of income under the all-events test of section 1.451-1(a), Income Tax Regs. As we stated in Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26, 34 (1988): The all-events test is based on the existence *115 or nonexistence of legal rights or obligations at the close of a particular accounting period, not on the probability -- or even absolute certainty -- that such right or obligation will arise at some point in the future. [Citations omitted.] As the Supreme Court stated in United States v. General Dynamics Corp., 481 U.S. 239, 245 (1987) (citing Lucas v. North Texas Lumber Co., 281 U.S. 11 (1930)), a fixed liability does not exist until "the last link in the chain of events creating liability * * * [has occurred]". Accordingly, a taxpayer does not properly accrue income from a disputed or contested claim until the date when the taxpayer has a fixed and determinable right to the settlement proceeds. See Triboro Coach Corp. v. Commissioner, supra; Foster Wheeler Corp. v. Commissioner, supra; Ameron, Inc. v. United States, supra; Rev. Rul. 79-278, supra. *116 In Shea Co. v. Commissioner, 53 T.C. 135 (1969), a case involving facts similar to the facts of the instant case, Shea Co. had a claim against the Federal Government for additional compensation under a construction contract. On June 30, 1962, Shea Co. distributed all of its assets, including the contract claim against the Federal Government, to its shareholders. Shea Co. formally dissolved under State law on August 23, 1962. The next day, August 24, 1962, the Government and Shea Co.'s transferees reached an oral agreement as to an approximate settlement figure. The parties exchanged documents and the final contract change order was sent by the Government on September 19, 1962, for acceptance. A release was executed on October 4, 1962, and on October 31, 1962, Shea Co.'s transferees received payment from the Government in settlement of the disputed claim. Despite the fact that Shea Co. and the Government reached an oral agreement just 1 day after Shea Co. dissolved, this Court held that corporate-level income tax did not apply to the liquidating distribution of the contract claim. We held that, under the all-events test, no income had been recognized *117 by Shea Co. on the disputed claim with the Government prior to the distribution of Shea Co.'s assets to its shareholders and its dissolution under State law. We noted that, because disputed claims are inherently contingent as to both the fact and the amount of liability, income could not be recognized when Shea Co. dissolved before final settlement was reached with the Government. We stated the following:
It is the very nature of these claims that negates the possibility that the Shea Co. had what may be considered undisputed or fixed rights to receive income prior to its liquidation and dissolution. * * * It was the settlements occurring after August 23, 1962, which resulted in the fixing of rights to receive such ascertainable amounts of income. A corporation, such as the Shea Co., which has adopted a plan of liquidation, distributed all of its assets to its shareholders, and dissolved under State law, has ceased to exist for tax purposes and has no tax liability for income accruing thereafter when the disputed claims are settled. James Poro, 39 T.C. 641 (1963) acq. 1963-2 C.B. 5. [Id. at 154.] As to the fact *118 that the parties reached an oral settlement just 1 day after Shea Co. dissolved, we stated the following: The fact that the preliminary settlement of the claims against the Bureau of Reclamation was reached on August 24, 1962, only 1 day after the formal dissolution of the Shea Co., might give rise to immediate suspicion that the claims were settled or could have been settled prior to or on the dissolution date. However, there is not a scintilla of evidence that this was the case and this suspicion alone, in the absence of any evidence to cast doubt on the bona fides of the date of settlement of these claims, is not sufficient to warrant a finding that the claims were settled prior to August 24, 1962. [Id.] In Shea Co., the Commissioner relied on Jud Plumbing & Heating, Inc. v. Commissioner, 5 T.C. 127 (1945), affd. 153 F.2d 681 (5th Cir. 1946), and Carter v. Commissioner, 9 T.C. 364 (1947), affd. 170 F.2d 911 (2d Cir. 1948), contending that, to clearly reflect income, the income realized from the settlement of the disputed contract claim should be allocated *119 to Shea Co.[5] We held that the Commissioner's reliance on the clear reflection of income analysis in Jud Plumbing was misplaced, stating as follows: The * * * [principal] distinction between Jud Plumbing and the case at hand lies in the fact that as of the final date of dissolution of Jud Plumbing corporation there existed earned or accruable income in the form of partially completed contracts as to which there was no dispute; the income therefrom, based upon the percentages of completion, was reasonably ascertainable. Claims based thereon were not contested claims of unknown and undeterminable worth as are the claims involved here. In affirming Jud Plumbing, the Court of Appeals reasoned that it was necessary "to allocate the income so as to reflect that which belonged to the Corporation." 153 F.2d at 685. A further statement was made that "'allocation of income' is chiefly a matter of the application of income tax law to basic legal rights." Id. Whether the words used are "belonged to" "earned," or "accrued," they all refer to a taxpayer's fixed and determinable rights in a certain amount of income. By virtue of the contested nature *120 of the claims before us, in contrast, it cannot be said that the Shea Co. had any income therefrom which "belonged to" or was accruable to it before it liquidated. The contested claims did not give rise to any accruable income as of the date of dissolution and no income from them can properly be allocated to the Shea Co. for its final taxable period. [Id. at 156-157; emphasis added.] We also distinguished Carter v. Commissioner, supra, on the ground that the corporation in Carter had a fixed and determinable right to the income in question prior to its dissolution, and that the Commissioner's allocation of the income to the corporation's final accounting period was therefore proper.
*121 In Foster Wheeler Corp. v. Commissioner, 20 T.C. 15 (1953), we addressed the issue of whether royalty payments owed to and owed by the taxpayer, the payment of which had been prohibited by an order of the Secretary of the Navy pursuant to the Royalty Adjustment Act of 1942, should have been included in the taxpayer's income during its taxable year 1945, the year royalties would have normally accrued under the taxpayer's method of accounting, or, in 1947, the year when the taxpayer and the Navy formally settled their dispute over the royalty payments. Additionally, we held that the fact that the taxpayer and the Royalty Adjustment Board of the Navy had reached a tentative settlement in 1946 did not provide the taxpayer with a fixed right to the royalty income in 1946. We stated the following: In January of 1946, the Royalty Adjustment Board of the Navy Department held a hearing to allow petitioner to present its evidence showing that the royalties were not excessive. After the hearing, the Board suggested that it would be willing to settle the dispute by allowing royalties computed at the rate of 1 per cent. The petitioner indicated that it would *122 find such a proposal acceptable. However, it was not until 1947 that the parties were finally able to reach an agreement. During that whole period the royalties in dispute remained frozen by the order of the Secretary of the Navy. Since the dispute continued through the year 1946 we think that an accrual of the royalties for 1946 in that year even if computed at the rate of 1 per cent would have been similarly improper. Although there may have been grounds for belief that the dispute would eventually be settled, by computing the royalties at that rate, such was by no means a certainty. Negotiations and conferences took place for well over a year prior to final settlement in 1947, and since the petitioner had no fixed right to obtain the royalties, it is correct in its contentions that the amounts were not includible in income until 1947. It was the continued existence of the dispute in its unresolved state that effectively precluded petitioner from receiving payment prior to that time. Cf. Cold Metal Process Co., 17 T.C. 916, 932. [Id. at 18-19; emphasis added.] In Triboro Coach Corp. v. Commissioner, 29 T.C. 1274 (1958), *123 the taxpayer, a bus company, asserted a claim against the city of New York for additional revenues under a transportation contract. During 1949, the city admitted that the taxpayer was entitled to additional revenues under the contract and made settlement offers to the taxpayer in that year. During June 1951, the taxpayer accepted the city's offer of settlement. On June 28, 1951, 2 days before the end of the taxpayer's fiscal year, the city's Board of Estimate passed a resolution approving the settlement. Approximately 1 month later, on July 31, 1951, the parties finalized the settlement by executing a settlement agreement. The taxpayer argued that the income from the settlement should have accrued during 1949, the year the city admitted that the taxpayer was entitled to additional payments under the contract. The Commissioner argued that the taxpayer did not have a fixed right to the income prior to the execution of a formal settlement agreement with the city, which did not occur until the taxpayer's taxable year ended June 30, 1952. We agreed with the Commissioner's position and held that the negotiations and settlement offer made to the taxpayer during 1949 were irrelevant *124 in deciding when the taxpayer had a fixed right to the settlement proceeds. We explained that, prior to the execution of the settlement documents on July 31, 1951, the city had taken no official action, and consequently, the taxpayer had no "right to * * * [the settlement proceeds] which is the basis justifying and requiring an accrual of income". Id. at 1279. [6]
As the foregoing cases show, the law is well settled that the assignment of income doctrine does not override section 336 in the case of a liquidating corporation that distributes items of potential income to its shareholders if, on the date of the distribution, the corporation does not have a fixed and determinable right to the income. *125 Moreover, it is clear that a binding settlement agreement is the sine qua non of a fixed right to income; neither an offer of settlement made during the course of negotiations nor a preliminary oral understanding creates a fixed right to income. In the instant case, petitioner contends that section 336 applies to BAC's liquidation because BAC distributed its claim under the RBFD contract to its shareholders before BAC had a fixed and determinable right to the settlement payments. The facts show that on September 29, 1986, BAC distributed its claim under the RBFD contract to A&S in exchange for A&S' stock in BAC. On October 2, 1986, BAC was dissolved under State law. On October 27, 1986, Revlon entered into agreements with BAC's three lenders (Equitable, Bankers Trust, and Manufacturers Hanover) to settle their claims against Revlon for $ 21,300,000. As part of the settlement agreement with BAC's lenders, Revlon made an offer to A&S, as the agent for the holders in interest in BAC, to settle the Revlon litigation for $ 19,450,000. A&S chose not to accept Revlon's October 27, 1986, offer, but continued to negotiate with Revlon and ultimately reached a settlement with Revlon on *126 December 2, 1986, for $ 23,700,000 ($ 4,250,000 more than the amount Revlon offered to settle for on October 27, 1986). Petitioner argues that Shea Co. v. Commissioner, 53 T.C. 135 (1969), and its progeny discussed supra, support petitioner's contention that BAC did not have a fixed right to the settlement payments prior to dates on which A&S and BAC's lenders executed formal settlement agreements with Revlon. Accordingly, petitioner contends that BAC did not have a fixed right to the settlement payments on or prior to September 29, 1986, the date BAC distributed its contract claim against Revlon to its shareholders. Additionally, petitioner contends that the exchange of draft settlement agreements between Revlon and BAC's lenders is irrelevant because the draft settlement agreements did not give BAC a fixed right to the settlement payments, and therefore, are not material to the resolution of the issue of when the right to the settlement payments became fixed and determinable. Respondent contends that BAC had a fixed right to the settlement payments prior to September 29, 1986. Respondent contends that BAC had a fixed and determinable right *127 to income from the disputed claim when Revlon acknowledged its liability to BAC prior to September 29, 1986. Respondent contends that Howard Gittis signed the undated proposed settlement agreement on behalf of Revlon prior to September 29, 1986, and that his signature on the proposed settlement agreement constitutes admission of liability by Revlon. Respondent also contends that Revlon's agreement allowing BAC to dissolve under State law without any effect on the litigation between Revlon and BAC, combined with Mr. Gittis' statement that he never expected the case to go to trial, supports respondent's contention that the parties had settled their litigation prior to September 29, 1986. Respondent contends that A&S' decision not to opt into the October 27, 1986, settlement agreement and to continue its negotiations with Revlon "does not change the uncontested nature of * * * [BAC's claim] and its taxation to BAC". We disagree. Respondent cites Johnson v. Commissioner, a Memorandum Opinion of this Court dated Mar. 6, 1947, for the proposition that, once an obligor admits liability, the income is fixed and determinable. In Johnson, the taxpayer was a partner in a partnership *128 that was engaged in the construction business. The partnership reported its income on the completed contract method of accounting. The partnership had entered into a contract with the United States to construct piers for the Grand Coulee Bridge that was being built over the Columbia River in Washington. The contract was completed and accepted by the Government 198 days after the completion date specified in the contract. As a result of the delay, the Government deducted and withheld $ 19,800 from the final payment to the partnership as liquidated damages. The partnership had reported the $ 19,800 on its Federal income tax return for its 1935 taxable year. The partnership subsequently filed a formal claim with the Government contracting officer for the remission of the $ 19,800 liquidated damages deducted by the Government and also claimed additional amounts to cover the partnership's loss on the contract, which the partnership alleged was due to delays caused by high water on the Columbia River. On October 29, 1935, the Government contracting officer ruled that only 52 out of the 198 days of the delay had been justified on account of high water and that $ 5,200 of the $ 19,800 *129 in liquidated damages deducted by the Government should be remitted to the partnership. All of the partnership's other claims were rejected. The partnership appealed to the Secretary of Interior who, on May 31, 1936, affirmed the decision of the contracting officer. The partnership then brought suit in the U.S. Court of Claims seeking to recover on the claims it presented to the contracting officer and to the Secretary of Interior. The court rendered its decision on April 7, 1941. The court sustained, in its entirety, the action of the contracting officer and held that the partnership was entitled only to a $ 5,200 refund. The partnership, on its Federal income tax return for its 1941 taxable year, claimed a $ 14,600 bad debt deduction. The Commissioner denied the bad debt deduction and determined that the $ 5,200 refund should have been included in the partnership's income during 1941. In Johnson, we held that $ 14,600 was not properly accruable in 1935, but held that the $ 5,200 refund was accruable in 1935 because the Government had not contested or disputed that amount at the close of the partner's 1935 taxable year. We explained that [In] the partnership's taxable *130 year 1935 the Government definitely denied its liability to pay to the petitioners $ 14,600 of the amount which it deducted or withheld as liquidated damages, and that its liability to that extent remained continuously in contest until the Court of Claims' decision was rendered in 1941. On the other hand, in October 1935 the government contracting officer admitted that the petitioners were entitled to $ 5,200 of the amount of damages withheld; and on this record it appears that at no time since October 1935 has the Government contested its liability to pay that amount. It matters not that the petitioners did not acquiesce in the rulings of the government contracting officer but chose to prosecute their total claims, including all the liquidated damages withheld, through to a final determination by the Court of Claims. The important factor is that since prior to the close of the partnership's taxable year 1935, the $ 5,200 has not been a disputed or contested item. * * * [Johnson v. Commissioner, a Memorandum Opinion of this Court dated Mar. 6, 1947.] We think that respondent's reliance on Johnson is misplaced. In Johnson, we stated that at the outset of the partnership's *131 dispute with the Government, the Government admitted that the partnership was entitled to a $ 5,200 refund and that the partnership therefore had a fixed right to the $ 5,200 in 1935. In the instant case, Revlon, in its answers to BAC's complaints in the Delaware State Court, denied all liability to BAC. Consequently, the amount BAC and its lenders received pursuant to the settlement agreements was in dispute at the outset of the litigation and remained in dispute until the litigation was formally settled on October 27, 1986 (with BAC's lenders), and December 2, 1986 (with BAC). Contrary to respondent's contention, even under the rationale of Johnson, the settlement proceeds in issue in the instant case would not be accruable until the litigation was finally resolved. Moreover, Revlon, unlike the partnership in Johnson, agreed to pay A&S and BAC's lenders a total of $ 45 million in exchange for their promise to dismiss their claims against Revlon. The fact that Howard Gittis signed the settlement proposal prior to the time BAC distributed its claim against Revlon to its shareholders does not a fortiori lead to the conclusion that BAC had a fixed right to the settlement *132 payments. To the contrary, we conclude that the consideration for the settlement payments to BAC and its lenders was their agreement to end the litigation against Revlon, and it was not until A&S and BAC's lenders executed formal settlement agreements with Revlon that the right to the settle payments became fixed. In Johnson, the partnership had already performed under the contract with the Government and was seeking, inter alia, a refund of the $ 19,800 that the Government withheld as liquidated damages. During October 1935, the contracting officer ruled that the partnership was only entitled to a $ 5,200 refund. Because the partnership had already performed under the contract, it was not until the contracting officer determined that the partnership was entitled to a $ 5,200 refund that the partnership had a fixed and determinable right to the income and should have reported the income in 1935. Finally, respondent's assertion that A&S and BAC's lenders had, in fact, settled with Revlon prior to the time BAC distributed its claim against Revlon on the RBFD contract to its shareholders and conspired to delay the execution of a formal settlement agreement solely for purposes *133 of tax avoidance is not supported by the record in the instant case. As we stated in Daniels v. Commissioner, T.C. Memo. 1994-591: "Summary assertions and conclusory allegations are simply not enough evidence to raise a genuine issue of material fact". Indeed, the only evidence in the record that respondent points to as supporting such contention is Mr. Gittis' statement, taken in a deposition in other litigation, that he was advised by his own attorneys that it would help BAC from a tax perspective if BAC were to liquidate and that he consented to BAC's liquidation because of his desire to facilitate a settlement of the litigation. [7] Mr. Gittis' statement, however, does not cast doubt on the bona fides of the settlement date. Rather, the record is replete with evidence showing that the parties were engaged in arm's-length negotiations up until the point of settlement. There is simply no support for respondent's contention that BAC, A&S, or any of the other parties to the litigation sought to delay the execution of a formal settlement agreement so that BAC could avoid Federal income tax on the settlement proceeds. *134 Finally, respondent contends that BAC had not completely liquidated when the settlement payments were made to A&S and BAC's lenders, and that the settlement proceeds are, therefore, taxable to BAC. Respondent concedes that BAC distributed its only asset, its claim against Revlon under the RBFD contract, to its shareholders on September 10, 1986, and that BAC was dissolved under State law on October 2, 1986. Respondent, however, contends that, because BAC had valuable claims for which it brought suit prior to its dissolution under State law, BAC should be deemed to be in existence when the settlement payments were paid to A&S and BAC's lenders. As noted above, corporate level tax may be avoided when a corporation, in the process of a complete liquidation, distributes items of potential income that are too contingent to be recognized as current income under any method of accounting. Where the corporation is found to have earned the income in question, however, the income has been taxed to the corporation if still in "existence" at the time the right of the income matured. See United States v. McDonald & Eide, Inc., 865 F.2d 73 (3d Cir. 1989); Wood Harmon Corp. v. United States, 311 F.2d 918 (2d Cir. 1963); *135 Hersloff v. United States, 159 Ct. Cl. 366, 310 F.2d 947 (1962); J. Ungar, Inc. v. Commissioner, 244 F.2d 90 (2d Cir. 1957); Messer v. Commissioner, 52 T.C. 440 (1969), affd. 438 F.2d 774 (3d Cir. 1971). Section 1.6012-2(a)(2), Income Tax Regs., the regulation which defines corporate existence, provides as follows: Existence of Corporation. A corporation in existence during any portion of a taxable year is required to make a return. If a corporation was not in existence throughout an annual accounting period (either calendar year or fiscal year), the corporation is required to make a return for that fractional part of a year during which it was in existence. A corporation is not in existence after it ceases business and dissolves, retaining no assets, whether or not under State law it may thereafter be treated as continuing as a corporation for certain limited purposes connected with winding up its affairs, such as for the purpose of suing or being sued. If the corporation has valuable claims for which it will bring suit during this period, *136 it has retained assets and therefore continues in existence. A corporation does not go out of existence if it is turned over to receivers or trustees who continue to operate it. [Emphasis added.] Based upon the foregoing regulation, we conclude that BAC was no longer in existence for purposes of Federal income taxation at the time A&S and BAC's lenders settled their litigation with Revlon. By October 27, 1986, BAC distributed its only asset, ceased doing business, and had dissolved under State law. Respondent's contention that BAC should be deemed to be in existence for purposes of Federal income taxation because it had a valuable claim for which it brought suit prior to its dissolution under State law is without persuasive support in the case law, the Code, or the regulations, and is not supported by the facts. The conclusions respondent draws from respondent's own statement of uncontested and material facts are speculative at best and are unsupported by any facts. Consequently, respondent's assertions are merely summary conclusions which are not the type that impede our ability to enter summary judgment. On the basis of respondent's own statement of uncontested and material *137 facts, we hold there is no genuine issue of material fact and that the assignment of income doctrine does not apply to the transaction in issue in the instant case. Consequently, BAC is not taxable on the settlement payments. [8]
*138 Based on the foregoing, An appropriate order and decision will be entered. Footnotes
1. See Wachner v. Commissioner, T.C. Memo. 1995-88↩, a Memorandum Opinion filed today involving some of the same transactions in issue in the instant case.
2. The record in the instant case provides no explanation as to why Equitable, Bankers Trust, and Manufacturers Hanover were involved in the negotiations with Revlon. Equitable, Bankers Trust, and Manufacturers Hanover were not parties in the Beauty Acquisition Corp. v. Revlon, Inc.↩, No. 8253 (Del. Ch., Dec. 12, 1985), litigation.
3. This figure includes the amounts paid to Equitable, Bankers Trust, and Manufacturers Hanover. The notice of deficiency neither allows nor explains why BAC'is not entitled to an offsetting deduction. We need not decide that issue because of our holding below that no portion of the $ 45 million Revlon paid to A&S is includable in BAC's income.↩
4. Sec. 336, in pertinent part, provides: SEC. 336(a). General Rule. -- Except as provided in subsection (b) of this section and in section 453B (relating to disposition of installment obligations), no gain or loss shall be recognized to a corporation on the distribution of property in complete liquidation. Sec. 336(a) was amended by sec. 631 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2269, and no longer provides for nonrecognition to corporations distributing property in complete liquidation.↩
5. In the instant case, respondent also relies on Carter v. Commissioner, 9 T.C. 364 (1947), affd. 170 F.2d 911 (2d Cir. 1948), and Jud Plumbing & Heating, Inc. v. Commissioner, 5 T.C. 127 (1945), affd. 153 F.2d 681↩ (5th Cir. 1946), as support for the contention that the assignment of income doctrine applies to the transaction in issue. For reasons stated herein, we think that respondent's reliance on these cases is misplaced.
6. Similarly, in Rev. Rul. 79-278, 1979-2 C.B. 302↩, 303, the Commissioner ruled that a plaintiff corporation did not accrue income from the settlement of a lawsuit until the "year that the court approved the settlement sum received by the taxpayer".
7. Mr. Fishman's Aug. 29, 1986, letter, however, states that Revlon, because of a "tax factor", did not want the BAC option to be exercisable until October. Consequently, Revlon may have been responsible for any delay in executing the settlement agreements with BAC and its lenders. The fact that Revlon and BAC may have acted with their own tax considerations in mind would not alone establish that their sole reason for executing the formal settlements during October and December of 1986 was to avoid BAC's having to pay Federal income taxes on the settlement payments.↩
8. Because we hold for petitioner under sec. 336, we need not address petitioner's contention that BAC is entitled to nonrecognition treatment under sec. 337 as in effect prior to the effective date of the Tax Reform Act of 1986, Pub. L. 99-514, 100 State. 2085. Curiously, respondent did not reply to petitioner's contention that BAC was entitled to nonrecognition treatment under sec. 337 and merely asked the Court to allow respondent to respond to petitioner's argument if the Court decides to address the issue. We are puzzled by such statement in light of the fact that the Court did not indicate that respondent should not address such issue. In the same vein, although we do not reach the issue because of our holding, we are puzzled why respondent did not address the issue of whether BAC would be entitled to a deduction for the settlement payments that were received by its lenders. See supra↩ note 3.